**APEX OIL COMPANY, Plaintiff,**

v.

**Joseph DIMAURO, et al., Defendants.**

**No. 82 Civ. 1796 (JMW).**

United States District Court,
S.D. New York.

Aug. 8, 1986.

See also 110 F.R.D. 490.

Cadwalader, Wickersham & Taft, New York City, for plaintiff; Richard J. Wiener, Pamela R. Chepiga, Jeffrey Q. Smith, of counsel.

Pollack & Kaminsky, New York City, for defendants Joseph DiMauro, Triad Petroleum, Inc. and TIC Commodities, Inc.; Martin I. Kaminsky, Edward T. McDermott, of counsel.

Shea & Gould, New York City, for The Coastal Corp., Coastal States Marketing, Inc., Belcher Oil Co., The Belcher Co. of New York, Inc., Belcher of New Jersey, Inc., and Belcher New England, Inc.; Michael Lesch, Yee Wah Chin, Adam B. Gilbert, Karen S. Frieman, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant New York Mercantile Exchange; William Hegarty, Peter Leight, Kathy Silberthau, of counsel.

Nutter, McClennen & Fish, Boston, Mass., for defendants Northeast Petroleum Industries, Inc. and Northeast Petroleum Corp; Neil P. Motenko, T. Christopher Donnelly, Lisa C. Wood, of counsel.

Katten, Muchin, Zavis, Pearl, Greenberger & Galler, Chicago, Ill., for defendants Stinnes Corp. and Stinnes Interoil, Inc.; Donald E. Egan, Lee Ann Watson, David K. Schmidt, James E. Hanlon, Jr., of counsel.

Brenner, Saltzman, Wallman & Goldman, New Haven, Conn., for defendant George E. Warren Corp; C. David Goldman, David R. Schaefer, James C. Graham, Marc R. Cohen, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant Julian Raber; Julius Berman, Phillip A. Geraci, of counsel.

Stein, Bliablias, McGuire & Pantages, Livingston, N.J., for defendant Eastern Oil of New Jersey; Kenneth McGuire, of counsel.

## OPINION

WALKER, District Judge.

### INTRODUCTION

Apex Oil Company brings this action against numerous defendants alleging antitrust conspiracy, Commodity Exchange Act violations, and fraud. The defendants are a number of companies and individuals, all of whom were participants in February 1982 in the futures market for No. 2 heating oil conducted through the New York Mercantile Exchange (the "Exchange").

Knowledge of the players in this case is critical. Plaintiff Apex Oil Company ("*Apex*") is a privately owned trader, refiner, and retailer of oil based in St. Louis. By uneasy convention, the defendants have been divided into two groups: The so-called "long defendants" include companies holding long positions in February 1982 heating oil contracts on the Exchange, their parent

corporations, and brokers representing some of the companies. They are:

1. Joseph *DiMauro*, a broker in both the commodity futures market and the cash, or "wet," market for heating oil.

2. Triad Petroleum, Inc. (*"Triad"*), DiMauro's brokerage firm for wet market oil transactions.

3. TIC Commodities, Inc. (*"TIC"*), DiMauro's futures commission merchant firm, or brokerage firm for futures market oil transactions.

4. The Coastal Corporation, Coastal States Marketing, Inc., Belcher Oil Company, The Belcher Company of New York, Inc., Belcher New Jersey, Inc., and Belcher New England, Inc. (collectively *"Belcher"*).

5. Stinnes Corporation and Stinnes Interoil, Inc. (collectively *"Stinnes"*).

6. Eastern of New Jersey, Inc. (*"Eastern"*).

7. Northeast Petroleum Corporation and Northeast Petroleum Industries, Inc. (collectively *"Northeast"*).

8. George E. Warren Corporation (*"Warren"*).

9. Former defendant Global Petroleum Corporation (*"Global"*) will be referred to throughout.

The so-called "exchange defendants" are the *New York Mercantile Exchange* itself and *Julian Raber*, vice chairman of the Exchange.

While the facts and allegations require detailed exposition, all arise from the same occurrence. In February, 1982, Apex was a "short" in the futures market for No. 2 heating oil, that is, it had numerous contractual obligations to *sell* No. 2 oil through the Exchange. On the other side of the contractual equation were the "long" companies, those holding contracts to *buy* Apex's No. 2 oil. In the middle were the exchange defendants, through whose offices these obligations were created, regulated, and ultimately resolved.

The crux of the matter is that Apex did not have the oil in early February, 1982 when the defendant oil companies wanted

it and accordingly claims it was obligated to purchase oil at artificially elevated prices to fulfill the contracts. After its unpleasant experience with this financial bind, Apex commenced this action, seeking damages on eight claims. The defendants have made six separate motions for summary judgment, which collectively address all claims by Apex.

## THE COMMODITY FUTURES MARKET

A basic familiarity with the workings of the commodity futures market is an essential roadmap in this case. An excellent discussion on that score has been provided by the late Judge Friendly in *Leist v. Simplot*, 638 F.2d 283 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), upon which this Court cannot improve. A few highlights drawn from that discussion create a sufficient background here.

A commodity futures contract is an executory contract for the purchase and sale of a particular commodity—No. 2 heating oil in this case. Everything about the contract is standardized except the price of the subject commodity, which is fixed by open outcry on the floor of the exchange at the time of contract formation. A single futures contract for No. 2 heating oil constitutes 1,000 barrels of oil at 42 gallons per barrel.

The seller of a contract, called a "short," commits to deliver the commodity at a future date. The buyer, called a "long," binds himself on that date to accept delivery of the commodity and pay the price agreed upon at formation of the contract. Most contracts, however, do not result in actual delivery by a short to a long. In the common situation, where a short or a long does not wish delivery of the physical item to occur, he will "liquidate" his positions prior to the close of trading in a particular futures contract. In this case, where the subject commodity was heating oil slated for delivery in February 1982, trading in the contract closed on January 29, 1982.

The liquidation of a contract before the close of trading lies at the heart of "futures trading." Money is made or lost by a participant when he liquidates by forming an opposite contract for the same quantity of the commodity so that his obligations to deliver and receive offset each other. That is, a short who does not wish to deliver must enter into an equal number of contracts to buy the commodity, i.e., long contracts. A long who does not wish to accept delivery must buy short positions. Gains or losses are measured by the difference between the prices of the offsetting contracts. If the market price of a future has increased prior to the close of trading, a long will realize a profit upon liquidation, while a short will lose. If the price has declined, the short will profit and the long will lose. It should be remembered that futures trading is a classic zero-sum game. Since every contract must have two sides, a long and a short, each gain by a market participant is accompanied by an equal loss by another participant.

In theory, there are two types of commodities customers: hedgers and speculators. The hedger is a trader with a parallel interest in the cash market for a commodity. He uses the futures market as a means of diminishing the risks faced in the cash market. While hedging is a complicated business, it may be generally grasped by imagining that the hedger is betting against his own cash market prospects by using the futures market. If he hopes to buy or sell a quantity of the cash commodity in the future, he will establish a position in the futures market which will be profitable if the price of the commodity moves in direction unfavorable to his cash market position. That way, losses in the cash market will be at least partially offset by gains in the futures market.

A speculator, on the other hand, is one who, in theory, has no real stake in the cash market and simply hopes to profit by trading in futures contracts as one might by investing in the stock market. By investing, the speculator assumes and seeks to profit from risks the hedger is specifically seeking to avoid.

The operation of a commodity futures market is characterized by several layers of professionals. A futures commission merchant, or broker, deals directly with the commodities customer. The broker communicates the customer's orders to a clearing member, an organization or individual with membership in the exchange. The broker may also be a clearing member, in which case the intermediate step is absent. As will become evident, the broker also plays an active role should the customer wish to deliver or take delivery of the actual commodity.

The clearing member then executes the order to buy or sell by way of a floor broker who stands on the actual floor of the exchange and makes contracts by open outcry and hand signals. An entity called a "clearing house," of which each clearing member is a part, plays a crucial role in the entire process. The clearing house is the heart of the exchange and operates as a seller to all buyers and a buyer to all sellers, thus facilitating the interchangibility of contracts and the liquidation of positions. The presence of this entity means an investor who wishes to liquidate or take delivery can always find a willing partner through the clearing house.

As discussed earlier, the most common outcome in the futures market is a liquidation of positions before the close of trading in a contract. Actual delivery of the commodity, however, does occur and that delivery process is critical to this case. In general, delivery is arranged when a short and a long each notify the exchange that they stand to give or take the possession of the subject commodity and not liquidate. When this occurs, the clearing house matches delivering shorts with accepting longs. As will be shown below, however, the matching details of place, method, and timing of delivery and any default or delinquency penalties are entirely the creature of the exchange's rules.

If the holder of a contract fails to liquidate by the close of trading, delivery under the exchange rules may yet be avoided by

agreement between the parties to "exchange futures for product" or an EFP. In such a transaction, the delivery obligation under the exchange contract is superseded by a new contract providing for the short to deliver product on the wet market.

## FACTUAL BACKGROUND

A detailed discussion of the facts will be included in the analysis of evidence at issue on each motion for summary judgment. A basic outline of the undisputed facts, however, will serve as a useful background for the evidentiary maze that follows.

The last day of trading on the Exchange for the February 1982 contract in No. 2 heating oil was Friday, January 29. Under the Exchange rules, all contracts not intended for delivery or EFP resolution had to be liquidated by the close of trading on that day. By the end of January 29, Apex held a short—i.e., a seller's—unliquidated position on 4,378 contracts. Since each contract represents 1,000 barrels at 42 gallons per barrel, Apex was obligated on its contracts to deliver 183,876,000 gallons of heating oil in February 1982.

By the close of trading that day, the other side of the contract picture had also crystallized. While there were 4,906 total contracts open and designated for delivery, 1,945 of those were held on the long side by six oil companies alleged by Apex to be wrongdoers. On January 29, 1982, the six held the following number of long contracts:

| | |
|---|---|
| Northeast | 748 |
| Warren | 170 |
| Belcher | 315 |
| Stinnes | 300 |
| Eastern | 50 |
| Global | 362 |

On Monday, February 1, 1982, Goldman Sachs & Co. ("Goldman"), Apex's clearing member, submitted to the Exchange a "Delivery Notice for Petroleum Products Futures" for its short contracts. Under the rules of the Exchange, the short was obligated to select a delivery site in New York Harbor for its contracts upon submission of the Delivery Notice. Apex chose the GATX terminal in Carteret, New Jersey as the delivery site for 4,281 of its 4,378 contracts. The remaining 97 contracts were designated for delivery at the B.P. terminal at Tremley Point, New Jersey.

Also on Monday, February 1, pursuant to the rules, the clearing members for the longs submitted the required "Notice of Intention to Accept Petroleum Products Futures." As usual, the clearing house operated to match receiving longs with delivering shorts and, on February 2, the Exchange issued Allocation Notices matching up longs and shorts for delivery. Apex was assigned to deliver the full amount due to each of the six longs, except for fifteen of Warren's contracts.

Under the Exchange rules, which were incorporated into each contract, a long was obligated between the second and fifth business day of the delivery month to designate the date and method of delivery. Delivery was permitted by barge, tanker, truck, pipeline, intra-facility transfer, inter-facility transfer, or book transfer. Intra- and inter-facility transfers are oil pumpovers between tanks at one facility and more than one facility, respectively. Book transfer under the rules, commonly referred to as inventory transfer, is accomplished "by transfer of title to the buyer without physical movement of product." The parties also employ the term "book transfer" to mean an accounting method by which companies holding mutual delivery obligations extinguish those obligations on their books without any actual transfer of title or oil. The Court will adopt the parties' practice and use "book transfer" to mean the accounting mechanism for extinguishing obligations; "inventory transfer" will connote transfer of title without movement of oil.

The nomination for each contract had to be delivered to the clearing house by no later than 4:30 p.m. on the fifth business day of the delivery month. In this case, the deadline was Friday, February 5, 1982.

Under the rules of the Exchange, a long could designate for delivery any day between the beginning of the first calendar day *after* the fifth business day of the month and the calendar day *before* the last business day of the month. In this case, that meant the earliest day on which delivery could be demanded was Saturday, February 6. A short was obligated to deliver on the designated delivery day and as soon as the designated barge or tanker reported readiness to load or as soon as the buyer reported the transfer facility or truck ready to accept the product.

Apex contends the long defendants, with the aid of broker DiMauro, agreed unlawfully during the first days of February to nominate their contracts for delivery in the first three delivery days of February, that is, February 6, 7, and 8. While there is a sharp dispute as to whether the defendant longs agreed to do so, there is no dispute that they in fact did nominate a large number of their contracts for delivery on the first few days. A chronology of those nominations is as follows:

*February 2—Global* nominated to take 51 of its contracts by barge on the morning of February 6 and 23 by barge on February 7.

—*Belcher* nominated to take all 315 of its contracts by barge at 12:01 a.m. on February 6.

—*Northeast* nominated to take 200 contracts by tanker at 8:00 a.m. on February 8, 1986.

—*Warren* nominated all 155 of its Apex-matched contracts for February 6.

*February 3—Northeast* nominated 75 contracts for barge receipt at 6:00 p.m. on February 6.

—*Northeast* nominated three separate barge loadings of 70 contracts each for 2:00 p.m. on February 6, noon on February 8, and noon on February 10.

—*Northeast* nominated 75 contracts for barge receipt at 6:00 p.m. on February 9.

—*Northeast* nominated to take 75 contracts by barge on February 10.

—*Northeast* nominated to take 75 contracts by barge at 6:00 p.m. on February 12.

—*Global* nominated to take 25 contracts by barge at 6:00 a.m. on February 6.

*February 4—Stinnes* nominated to take its 300 contracts by inventory transfer on February 6.

*February 5—Eastern* nominated to take all 50 of its contracts by inventory transfer on February 6.

—*Global*, altering nominations previously made but not listed above, nominated to take 111 contracts by book transfer on February 6.

—*Global* nominated an additional 25 contracts for inventory transfer on February 6.

—*Northeast* nominated to take 13 contracts by book transfer and 25 contracts by inventory transfer on February 10.

On Wednesday, February 3, Jeffrey Atkin, a member of the Exchange and a floor broker representing long interests, stated on the floor of the Exchange that Apex would be unable to make delivery. The Control Committee of the Exchange was convened that same day to hear Atkin's statements. The Control Committee is a body charged by the exchange by-laws with the "endeavor to correct any circumstances which interfere with or might interfere with the normal functioning of the market." It investigates market problems and attempts to resolve them by informal discussions, or "jawboning," with members of the Exchange. The minutes of the February 3 committee meeting reflect that Atkin said "he had learned from industry sources that Apex did not have oil to deliver to his customers." That same day, the Control Committee contacted Apex's clearing member, Goldman, and requested and received assurances that Apex had oil to deliver at GATX at the times requested by the longs.

On February 4, Goldman told the committee that Apex would make timely delivery using 750 contracts coming from Amoco and another 400 owned by or owed to Apex presently at GATX.

On February 5, however, Goldman informed the Control Committee that Apex's situation was different than previously represented. Apex did not have the necessary oil available at GATX. The 750 Amoco contracts would not be available for delivery to GATX on February 6, 7, or 8. In fact, there was a *negligible* amount of oil available for delivery at GATX on February 6.

During February 4 and 5, the Control Committee, under the leadership of acting committee chairman and defendant Julian Raber, spoke to the clearing members representing holders of long positions in February. The clearing members were asked to urge their customers to agree to change delivery dates and sites. By the end of the day on February 5, all contracts slated for delivery on February 6 had been resolved with the exception of Stinnes' 300 contract nomination. In the late evening on February 5, in an effort to resolve the remaining contracts under this nomination, Raber met privately with DiMauro of TIC in the "Market Bar" restaurant at the World Trade Center. Both men testified that Raber urged DiMauro to negotiate with Apex to resolve the contracts and avert a crisis.

Eventually, all the delivery obligations were satisfied by EFP or delivery and Apex did not default. The resolution of this difficult situation, however, is the basis for Apex's claims. Apex claims that the long defendants conspired, (with the conspiratorial acquiescence of the Exchange and Raber), manipulated, and fraudulently insisted on delivery in the first few delivery days of February. In addition, it claims that Raber and the Exchange violated their statutory duties by failing to remedy the unlawful position in which Apex was placed. As a result, Apex alleges that it was forced to meet its delivery obligations by purchasing artificially high-priced oil on the cash market and from the longs themselves.

For example, while the February contract for No. 2 oil closed at a price of 89.7 cents per gallon, Apex alleges that it had to purchase 500,000 barrels of oil from Northeast at 96.25 cents per gallon and then transfer the product back to that company in satisfaction of its futures contracts with Northeast. Also on February 5, Apex claims it purchased 362,000 barrels from Global at 95 cents per gallon and transferred the oil back to Global to resolve its February contracts with that company. Additionally, Apex alleges it paid 97.5 cents per gallon for oil from Stinnes and Eastern which was then delivered back to those companies in resolution of the February contracts.

In short, Apex believes that it was forced to buy into the "wet market" at artificially high prices as a result of the fraud, conspiracy, and manipulation by the various defendants and that the exchange defendants failed to remedy the unlawful situation by permitting deferred delivery. It is this unhappy series of events which gives rise to the eight claims asserted in the amended complaint to which we now turn.

### THE ALLEGATIONS

(1) *Antitrust* The first four claims for relief allege violations of the Sherman Act, 15 U.S.C. § 1 *et seq.* ("the Act").[1] The first three allege violations of Section 1 of the Act; the last involves Section 2. All four seek treble damages under the Act.

(a) Claim I alleges that the long defendants *and* the exchange defendants conspired to nominate for early delivery of the oil due the longs on their futures contracts.

(b) Claim II alleges that the long defendants conspired not to deal with Apex and refused to sell or make available No. 2 oil and as a result created an artificially high price for the oil in February 1982.

(c) Claim III alleges that the long defendants conspired to limit Apex's access to sources of No. 2 oil in February 1982 and

---

**1.** The Amended Complaint also alleges in the first four claims that defendants violated Section 340 of the New York General Business law. Apex has not argued that analysis of the conspiracy claims is different under this provision than under the Sherman Act. Accordingly, the discussion of the Sherman Act claims applies as well to the New York claims.

as a result created an artificially high price for the oil.

(d) Claim IV alleges that the long defendants conspired to monopolize the market for deliverable No. 2 heating oil in early February 1982.

(2) *Commodities Manipulation* Claim V alleges all defendants violated Sections 9(b) and 13(a) of the Commodity Exchange Act, 7 U.S.C. §§ 13(b), 13c(a), both by manipulating the price for No. 2 oil on the Exchange in February 1982 and by participating in the spreading of false reports about Apex. (These claims have been abandoned as to the exchange defendants. *See* discussion, *infra* ).

(3) *Fraud*

(a) Claim VI alleges fraud by the long defendants under Section 4b of the Commodity Exchange Act.

(b) Claim VIII alleges common law fraud by the long defendants.

(4) *Regulatory Failures* Claim VII alleges the exchange defendants violated the Commodity Exchange Act and rules promulgated by the Commodity Futures Trading Commission by failing to properly regulate the trading and delivery of No. 2 heating oil under exchange contracts in February 1982.

After over three years of discovery in this fact-intensive case, including more than 120 depositions and the production of mountains of documents, the defendants have made summary judgment motions which collectively address all claims. The motions have been extensively briefed in support and opposition and argued orally at great length.

ANTITRUST AND THE LONG
DEFENDANTS: CLAIMS I–IV

(1) *Introduction*

Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ...

26 Stat. 209, as amended, 15 U.S.C. § 1. Section 2 of the Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor ...

26 Stat. 209, as amended, 15 U.S.C. § 2.

The defendants have narrowly addressed their summary judgment motion on the four antitrust claims to the question of conspiracy. Without conceding that a conspiracy would be *per se* unlawful in the context of this case, the defendants contend there is no material issue of fact concerning the allegations that:

—all defendants conspired to demand delivery of the No. 2 oil in early February 1982;

—the long defendants conspired to limit Apex's access to No. 2 oil;

—the long defendants conspired to fix the price of No. 2 oil; and

—the long defendants conspired to monopolize the market for No. 2 oil in early February 1982.

In short, the defendants argue there is no triable issue of fact as to whether *any* conspiracy existed with respect to the February 1982 heating oil futures contracts.

(2) *Summary Judgment Standard*

Under Fed.R.Civ.P. 56(c) the movant on a summary judgment motion bears the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the movant has carried this burden, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must "do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith*

*Radio Corporation,* — U.S. —, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where the record could not lead a rational trier of fact to find for the non-movant, "no genuine issue for trial" exists. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

The Supreme Court's recent decision in *Matsushita* explains the standard for summary judgment in the context of an antitrust conspiracy and details the method by which a district court should examine the voluminous record in search of a "genuine issue for trial." While some controversy may have existed prior to *Matsushita* concerning the proper standard for *horizontal* conspiracy cases such as this one, the first sentence of Justice Powell's opinion leaves no doubt as to that case's broad application: "This case requires that we again consider the standard district courts must apply when deciding whether to grant summary judgment in an antitrust conspiracy case." *Id.* 106 S.Ct. at 1351.

The teaching of *Matsushita* and the Court's earlier decisions in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) and *Cities Service* is that summary judgment *is* available in the context of a large antitrust conspiracy case. In fact, the authorities indicate that the nature of such a case demands that the district court, in considering summary judgment, give searching scrutiny to the inferences available from the typically ambiguous mass of evidence.

In *Matsushita,* the district court had been faced with a summary judgment motion in an action that had been through years of discovery and involved twenty-one co-defendant corporations from the Japanese electronics industry. The trial court found that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged conspiracy. 106 S.Ct. at 1352. The Third Circuit reversed the grant of summary judgment, holding that, based on inferences from the admissible evidence, "a reasonable factfinder could find a conspiracy ..." *Id.* at 1353.

In reaching that conclusion, however, the Third Circuit "apparently did not consider whether it was as plausible to conclude that petitioners' ... behavior was independent and not conspiratorial." *Id.*

The Supreme Court held that the Third Circuit had applied the wrong standard. It concluded that the appeals court should have been more skeptical in its treatment of inferences drawn from the evidence of conspiracy in an antitrust case because "antitrust law limits the range of permissible inferences from ambiguous evidence ..." The Court reiterated its earlier holding in *Monsanto* that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 1357 (citing *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471).

Building upon *Monsanto,* a case which involved an alleged *vertical* price-fixing conspiracy, the Court promulgated a general rule for *all* antitrust conspiracy cases:

To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently [citing *Monsanto* ]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action ...

106 S.Ct. at 1357.

*Matsushita* involved allegations that the defendant Japanese electronics manufacturers and distributors had violated Section 1 of the Sherman Act by "dumping" products in the United States market and engaging in concerted "predatory pricing" in an effort to dominate the American market for electronics products with a view to subsequently raising prices. The petitioners in *Matsushita* argued that in light of the evidence's ambiguity, the absence of any rational motive to engage in predatory pricing, and the fact that the subsequently higher prices necessary to offset the predatory pricing losses had not occurred after

twenty years, no trier of fact could reasonably conclude that the conspiracy existed.

The Supreme Court agreed that since predatory pricing was economically nonsensical, the admissible evidence did *not* tend to exclude the competing inference of independent pro-competitive conduct. The Court reemphasized "that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter pro-competitive conduct ... [M]istaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.* at 1360 (citations omitted).

In this case, Apex has argued, in effect, that *Matsushita* cannot mean what it seems to say because the Court failed to overrule its earlier decision in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In *Poller,* the Court considered the propriety of summary judgment in the context of an antitrust conspiracy case involving an alleged attempt by CBS and an affiliate to dominate the UHF television market in Milwaukee, Wisconsin. In a fact-specific decision, the Court concluded that summary judgment was inappropriate: "We look at the record on summary judgment in the light most favorable to Poller, the party opposing the motion, and conclude that it should not have been granted." *Id.* at 473, 82 S.Ct. at 491.

In reversing the grant of summary judgment, the Court in *Poller* did employ language that appears contrary to the spirit of *Matsushita:*

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for

trial by jury which so long has been the hallmark of "even handed justice."

368 U.S. at 473, 82 S.Ct. at 491 (footnote omitted).

Plaintiff naturally relies heavily on this language to urge that summary judgment must be used sparingly in complex antitrust cases. However true that sentiment may have been in 1962, it is not true today. The Supreme Court's recent opinions, particularly those in *Monsanto* and *Matsushita,* signal a marked change from the reticence to grant summary judgment of *Poller,* a change spurred, perhaps, by the onslaught of massive antitrust litigation over the last twenty years and the attendant stress on the administration of justice. It is also significant that *Matsushita,* in elucidating a standard which requires the district judge to carefully parse inferences before sending an antitrust case to a jury, does not mention *Poller,* a silence which speaks volumes about the Court's intentions.

The Supreme Court's recent decisions in *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corporation v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) offer further encouragement to a district court to utilize the summary judgment procedure. In *Anderson,* the Court decided that a district court, after assessing the proofs submitted by the non-movant plaintiff, should grant summary judgment in a libel case unless they met the "clear and convincing" standard required to prove malice. Citing *Cities Service* and *Adickes,* the Court made clear that a summary judgment motion is to be treated in the same manner as one for a directed verdict: The question is not whether there is *any* evidence supporting the non-movant but whether "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* —— U.S. at ——, 106 S.Ct. at 2511 (citation omitted). Thus, the Court reasoned, analysis in light of the appropriate evidentiary standard was required.

In *Celotex*, the Court held that even where the movant's proofs were meager and failed to negate the opponent's claims, summary judgment should still be granted where the evidence of the non-movant was deficient as to a necessary element of the claim as to which the non-movant bore the burden of proof. In that situation, summary judgment should be granted "since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Id.* — U.S. at —, 106 S.Ct. at 2553. The "showing" required for the summary judgment movant to meet its initial burden did not require actual evidence but merely a "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* — U.S. at —, 106 S.Ct. at 2554.

Both *Anderson* and *Celotex* reaffirm the principle that the summary judgment procedure should be used to dispose of cases that should not be tried. As the Court stated in *Celotex,*

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just speedy and inexpensive determination of every action."

*Id.* — U.S. at —, 106 S.Ct. at 2555 (citations omitted).

In *Modern Home Institute, Inc. v. Hartford Accident and Indemnity Company*, 513 F.2d 102, 110 (2d Cir.1975), Judge Mansfield wrote that summary judgment is particularly appropriate where an antitrust plaintiff has had ample opportunity "to obtain whatever proof of a conspiracy there may be in the hands of defendants." In that situation, "[i]f the most that can be hoped for is the discrediting of defendants' denials at trial, no question of material fact is presented." *Id.* (citations omitted).

More recently, the Seventh Circuit stressed the potentially important role of summary judgment in large antitrust cases:

When a District Court has afforded the parties eight years of unlimited discovery, the parties have designated the evidence on which they will rely at trial, and the Court has had an opportunity to review the evidence and concludes that no reasonable jury could return a verdict for plaintiffs, judicial economy mandates that summary judgment be entered. A trial on such claims would serve only as a forum for impeachment and argument by counsel; not for the presentation of evidence.

*Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 464 (7th Cir.1981) (citations omitted), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982).

In *Matsushita*, the Supreme Court made it clear that in an antitrust conspiracy case ambiguous evidence is to be treated skeptically on a motion for summary judgment, since an inference of unlawful conduct which arises only from ambiguous evidence will be of no use to the plaintiff at trial. In *Monsanto*, the Court warned that a standard which permitted trial on the basis of such inferences presented "a considerable danger" that pro-competitive conduct would be discouraged. 465 U.S. at 763, 104 S.Ct. at 1470. The test enunciated in *Matsushita* also dictates that ambiguous evidence, because it is by definition incapable of a dominant inference, will not alone defeat a motion for summary judgment.

In this case, defendants' sworn denials are more than sufficient to shift the burden to plaintiff under Fed.R.Civ.P. 56(e). *Weit*, 641 F.2d at 461; *see Celotex*, —. U.S. at —, 106 S.Ct. at 2553. Thus, to survive defendants' motion for summary judgment, Apex must establish that there is a genuine issue of material fact as to whether defendants entered into a conspiracy. To make such a showing, Apex must offer significant probative evidence which tends to exclude the possibility that the alleged conspirators acted independently. *Matsushita*, 106 S.Ct. at 1357; *Cities Service*, 391 U.S. at 285, 88 S.Ct. at 1590–91; *Weit*, 641 F.2d at 462.

### (3) *Parallel Conduct*

It is a "familiar doctrine that the existence of a conspiracy rarely can be established by direct proof but usually is inferred from acts, declarations and conduct of the alleged members of the unlawful combination." *Hunt v. Mobil Oil Corp.,* 465 F.Supp. 195, 223 (S.D.N.Y.1978) (citations omitted), *aff'd mem.* 610 F.2d 806 (2d Cir.1979). And, as discussed, *Matsushita* makes it the duty of the court on summary judgment to carefully examine circumstantial evidence and its concomitant ambiguities.

■ Circumstantial evidence alone, however, can be sufficient to support a finding of an antitrust conspiracy. *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). In fact, as in this case, parallel business behavior—"conscious parallelism"—is the type of circumstantial evidence often relied upon to support an allegation of conspiracy. As will be seen, Apex devotes substantial effort to the construction of an inference of conspiracy from proof of parallel conduct plus a wide range of alleged circumstantial evidence. While the parties have disputed the extent to which Apex relies on parallelism to infer conspiracy, it is obvious that that method of proof is at the heart of Apex's attempt to survive this summary judgment motion.

In *Interstate Circuit,* plaintiff alleged that a group of motion picture distributors had conspired to restrict later showings of newly distributed films in certain Texas cities, thus benefiting first-run theatres. There was no direct evidence in the case showing that the distributors had agreed with one another to impose the restrictions, but each distributor knew the others had considered the same proposal and knew the restrictions would work only if adhered to by all distributors. In addition, concerted action would create a likelihood of increased profits for each individual distributor which did not exist if less than all distributors imposed restrictions.

On those facts, the Supreme Court held that an inference of agreement to restrain competition could reasonably be drawn. In *Cities Service,* the Court explained that the inference was possible in a case like *Interstate Circuit* because the parallel behavior there was accompanied by an identical motive: each conspirator stood to gain greatly from a cartel. On the other hand, independent action would rationally lead to economic losses since others could not be counted on to act in the same manner.

The facts in *Cities Service* were markedly different and permitted no inference of conspiracy from circumstantial evidence of parallel action. In that case, plaintiff claimed that Cities Service Oil Co. ("Cities Service") was part of a conspiracy among oil companies to refuse to buy plaintiff's Iranian oil. The Court held that although Cities Service, like the other oil companies, had refused to deal, an inference of conspiracy did "not logically follow" because Cities Service could not possibly have benefited from a refusal to deal with the plaintiff; it made no economic sense for Cities Service to join the boycott. 391 U.S. at 287, 88 S.Ct. at 1591–92.

*Modern Home* sheds further light on the use of parallel behavior in the antitrust context. There, the Second Circuit noted that "parallel behavior alone is not sufficient evidence of conspiracy" and the mere fact that all defendants acted in the same manner, even if each "knew the other defendant companies were doing like-wise, is not enough to defeat the motion for summary judgment." 513 F.2d at 110 (citations omitted). The court explained that where the parallel conduct demonstrated by plaintiff was "consistent with independent competitive decisions ...[,] [a]dditional facts or circumstances are needed to show that the decisions were interdependent and thus raise the inference of a tacit agreement ..." *Id.* On the other hand, "[a]ctions against the apparent individual economic self-interest of the alleged conspirators may raise an inference of interdependent action," as may actions which would make economic sense *only* if done in concert. *Id.* at 111.

### (4) *The Evidence*

We now turn to the evidence offered by Apex to determine if it has met its burden of producing significant probative evidence of concerted behavior which tends to exclude any competing inference of independent action. In its opposition papers, Apex has attempted to divide its case for conspiracy into direct and circumstantial evidence. In this regard, Apex contends it has offered sufficient direct evidence of a conspiracy among the defendants to defeat a motion for summary judgment without recourse to inferences from circumstantial or ambiguous proof. As will be seen below, however, the distinction between direct and circumstantial evidence is a murky one, particularly in the context of an alleged antitrust conspiracy where confessions and smoking guns are few and far between. As one court has noted: "It does not strain credulity that solemnized covenants to conspire are difficult to come by in any price fixing case." *In re Plywood Antitrust Litigation*, 655 F.2d 627, 633 (5th Cir.1981), *cert. dismissed sub nom. Weyerhaeuser v. Lyman Lamb*, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983).

It is also apparent from the organization of Apex's memorandum in opposition that it intends to present an imposing overall picture of a conspiracy constructed from a myriad of evidentiary inferences. While any one piece might not reasonably infer conspiracy, Apex attempts to present a completed puzzle which will. The sheer volume and desultory organization of the facts presented makes dissection of Apex's evidence an unenviable task, but it is an effort mandated by *Matsushita*.

It must be remembered throughout this exercise that an assumption of conspiracy is *not* the starting point after which each event must be explained away by the defendants. Rather, it is Apex, now faced with unequivocal sworn denials, that must demonstrate that the evidence, construed in its favor, supplies an inference of conspiracy that is reasonable in light of any competing inference of independent conduct proffered by the defendants. In this regard, it is critical that Apex's often bewildering effort to treat the "longs" as a monolith be resisted. Evidence must be presented which tends to establish that *each* defendant made a conscious commitment to concerted action. Moreover, inadmissible hearsay may not be considered and the co-conspirator exception to the hearsay rule may only be employed after Apex has offered evidence which independently tends to establish that the declarant under consideration is a member of the conspiracy.

### (a) *"Direct" Evidence*

1. *Schultz Testimony.* Apex offers the testimony of Jerry Schultz, a commodities trader in 1982 with Tipco Products, Inc., as direct evidence of conspiracy. Tipco held a long position in February contracts and had been matched for delivery with Apex. Schultz testified at his deposition that on the morning of Tuesday, February 2, he received a phone call from Joe DiMauro's brother Sal, of defendant Triad. Triad was a broker who represented parties to wet market contracts. Apex characterizes Schultz's testimony as stating that Sal DiMauro invited him to participate in a "short squeeze" of Apex. Apex contends Schultz was asked by Sal DiMauro to nominate Tipco's contracts for early delivery and "came to understand the conspiring longs included Belcher, Northeast, Stinnes and Global."

Schultz testified that he was concerned about nominating early in the delivery month because he had no storage. In response, Sal DiMauro stated that storage arrangements could be worked out. When Schultz expressed uncertainty over the proper steps for nomination, Sal DiMauro had a representative of TIC, the commodities broker, call and explain the nomination process. When Schultz continued to have questions, he asked for a telex explaining the necessary steps. Instead, he received a copy of a telex addressed to Conticommodity Inc. ("Conti"), Tipco's clearing member at the exchange, stating that Tipco wished to take delivery of all its February contracts on February 6, the first possible

delivery date. Schultz testified that he never authorized the sending of the telex to Conti.

Apex argues that this testimony is direct evidence that Sal DiMauro, brother of defendant Joe DiMauro, and an employee of defendant Triad, was recruiting co-conspirators to nominate early and demand delivery from Apex. Despite Apex's effort, however, this testimony produces no direct evidence and, in fact, only serves to create extremely ambiguous circumstantial evidence of conspiracy.

Apex has mischaracterized Schultz's testimony. The full text of the Schultz deposition reveals that he was *never* asked to participate in a "short squeeze" and DiMauro *never* used those words in their conversation of February 2. Schultz said he did not think DiMauro was asking Tipco to nominate on the first delivery day and no one tried to pressure him to nominate on a particular day. Contrary to Apex's phraseology, Schultz *never* "came to understand the conspiring longs included Belcher, Northeast, Stinnes and Global." He merely testified that "at some point" he "came to realize" that those companies were among those holding long positions matched with Apex. All this, of course, was market information.

Even if it may be concluded from Schultz's testimony that he knew a "short squeeze" was taking place, it is entirely unclear what he intended that term to mean. Schultz's use of the phrase is susceptible to two radically different meanings. It could import a conspiratorial effort to apply pressure on a short or it could mean a circumstance brought about by market forces upon a short's failure to secure adequate supply. Thus, even if Schultz's testimony is construed as Apex wishes, it does not support an inference of conspiracy which tends to exclude the inference of independent action; at best for Apex, it is ambiguous.

The remainder of the circumstantial evidence gleaned from Schultz's testimony by Apex is of little use. The offer of storage by DiMauro is probative of nothing; Di-Mauro was a broker for Tipco who attempted to facilitate transactions for his customers and stood to receive a fee for arranging storage. The telex sent to Conti on behalf of Tipco is ambiguous. It was a *preliminary* indication of a desire to nominate and expressly provided that "further delivery instructions" were intended. In light of the fact that Schultz had inquired as to the procedure for nomination, the telex at best presents competing inferences. Any inference of conspiracy drawn from it simply does not "tend to exclude" the competing inference that it was the work-product of an aggressive brokerage firm soliciting its client's business.

2. *Densieski Statements.* Apex offers as direct evidence the statements of Tony Densieski, an employee of Texas Energy, another long matched with Apex in February 1982. Densieski's statements are reported first by John Treat, Senior Vice-President of the Exchange, who described a telephone conversation with Densieski in February, during which Densieski allegedly reported that he had been recruited by unspecified "longs" to take advantage of Apex's "difficult position." Neither Densieski nor Texas Energy are alleged to be co-conspirators, so Densieski's statements, as reported by Treat, are inadmissible hearsay. And even if this testimony were admissible, it is of minimal probative value. Considering the size of the open position on the Exchange in February contracts, the vague reference to "longs" is non-probative against the defendants.

Other statements by Densieski are reported through the testimony of Paul Beenen, an employee of the Exchange, who testified that he too spoke to Densieski in February 1982. Not only is this testimony also inadmissible hearsay, but it does no more than state that "people" were taking "advantage" of Apex because it was "subject to market pressures and did have to go to the cash market to get oil that they eventually didn't have in place...." This is merely evidence that Apex had difficulty meeting its obligations and that unspecified

parties were doing unspecified things to take "advantage" of the situation.

It should be noted here, and remembered throughout the discussion of Apex's evidence, that there is nothing unlawful about "taking advantage" of Apex. The fact that a long, aware of Apex's shortage of deliverable oil, chose to stand by its nomination and extract concessions from Apex at most shows the long and Apex are players in an aggressive market. Such conduct may not be nice, but it does not tend to establish an actionable antitrust violation. The issue at the heart of this discussion is whether two or more defendants *together* decided to exercise their rights and by so doing take advantage of Apex. Without proof of concerted action, the parallel assertion of legal rights provides no reasonable inference of conspiracy. *Hunt v. Mobil Oil Corp.*, 465 F.Supp. 195, 229 (S.D.N.Y.1978), *aff'd mem.* 610 F.2d 806 (2d Cir.1979).

3. *Bernstein Statements.* Apex claims Jay Bernstein, an employee of Northville Caribbean, another long matched with Apex, presents direct evidence of the conspiracy. It says Bernstein knew "other longs were forcing Apex to deliver early and were offering Apex a buy out at very high prices.... Northville Caribbean, however, elected not to participate in the conspiracy."

This characterization of Bernstein's testimony is absurd. He never spoke of a "conspiracy." And even his actual testimony, while nonhearsay, is of dubious probative value because he referred only to "other longs" and said he had no personal knowledge of the longs' actions.

4. *Raber Statements.* The fourth piece of so-called direct evidence presented by Apex is provided by the reported statements of defendant Julian Raber, vice chairman of the Exchange, and an alleged co-conspirator. Patricia Lyons, an employee of Apex, recorded that Raber told her on February 11, 1982 that he was aware there had been "a conspiracy to 'squeeze the shorts.'" Paul Novelly, President of Apex, also testified that Raber later referred to the events of the first week of February as a "sting."

These statements are inadmissible hearsay. Fed.R.Evid. 801(d) provides:

A statement is not hearsay if—

(2) The statement is offered against a party and is ... (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

At oral argument, Apex's counsel stated that it is Apex's contention that the conspiracy began on February 1, 1982 and ended no later than February 8, 1982. Thus, these statements, even if construed in the manner urged by Apex, were made *after* the completion of any conspiracy and not "during the course of" a concerted effort. The statements also cannot be characterized as ones made "in furtherance" of the conspiratorial enterprise. It hardly furthers a conspiracy's purposes for a co-conspirator to implicate his fellows. Lyons also never said Raber used the word "conspiracy"; that was a helpful gloss added by her. Moreover, the use of the term "sting" by Raber is as consistent with independent action as with a conspiracy. Finally, as discussed below, there is no independent evidence to establish that Raber was a member of the conspiracy and was therefore ever capable of making a "co-conspirator" statement.

5. *Karam Statements.* Apex's fifth piece of "direct" evidence consists of the statements of Fred Karam, president of Karam Petroleum Company. Edwin Wahl, an Apex employee, testified that he spoke to Karam on the third or fourth day of February and Karam told him that defendant George E. Warren Corporation was "trying to blank you," that is, trying to get Apex.

First, this testimony is nonprobative. Karam *actually* told Wahl that "he had heard some rumors" that Warren was out to get Apex; he never said someone from *Warren* declared that company's malicious intention. Even a direct statement of Warren's animus towards Apex, however, would not be probative of a *conspiracy* to

get Apex. As noted earlier, there is nothing illegal about aggressive, even nasty, competitive behavior standing alone. Second, even if Karam was reporting statements by Warren employees, the testimony of Wahl about Karam statements about Warren statements is double hearsay and inadmissible.

6. *Atkin Statement.* The final piece of evidence claimed to be direct by Apex is the statement of Jeffrey Atkin, the floor broker for several of the long defendants. Daniel Mancusi, head of the Exchange clearing house, testified that Atkin told the February 3 meeting of the Exchange's Control Committee that "one or two of his customers were out to get Apex."

This statement, too, is inadmissible hearsay. Atkin is not an alleged co-conspirator. Even if the statement were admissible, it is of little probative value concerning the conduct of particular defendants. Mancusi's report of Atkin's statement does not specify what "customers" Atkin meant or what being "out to get" Apex entailed.

Finally, the fact that "one or two" customers sought to "get" Apex is neither probative nor surprising. There is no serious dispute in this case that Apex was not well-liked. The market had moved sharply against the longs since the purchase of their contracts. They had purchased the February contracts at prices ranging from $1.0375 to $.9020 per gallon and the closing price for February oil was $.897 per gallon. During the market's fall in late January they had been forced to expend substantial sums on margin payments. The longs believed that it was Apex's massive expansion of its short position during January which depressed the futures price for No. 2 oil, forcing them to incur margin costs and allowing Apex to reap large liquidated and unliquidated (i.e., paper) profits. In fact, it is the defendants' contention—and the subject of counterclaims—that Apex played a high-stakes game of expansion in short positions right up until the close of trading on January 29 in the hope that it could defer delivery over the month of February while the market price continued to drop, result-ing in additional profits. There is little doubt that a long might have harbored ill will toward Apex resulting in a desire to "get Apex." Nonetheless, such a desire, even if properly evidenced, would not necessitate an inference of conspiracy; it is as consistent with independent action.

(b) *Circumstantial Evidence*

1. *Late January Purchases.* Apex claims that purchases of long positions by the defendants in late January without economic justification are evidence of a conspiracy. Apex does not contend the conspiracy existed at that point, but merely that the unsound purchases are evidence of the later formed conspiracy. On January 27, Belcher purchased 80 contracts and Warren purchased 158. On January 28, Northeast bought 331 contracts.

*Northeast:* Apex asserts that the late January purchases support an inference of unlawful behavior by Northeast because prior to the establishment of these long positions, Northeast had severely cut back its scheduled receipt of oil in January and February from wet market suppliers.

*Belcher:* Apex also claims that Belcher bought these late January contracts at a time when it was declining to accept deliveries from its oil suppliers.

*Warren:* Apex argues that Warren's late purchases are suspicious because none of the Warren witnesses could remember why they increased their February long position at the end of January.

Without explicitly saying so, Apex apparently believes these are "parallel acts against interest" in January that support an inference of a conspiracy in early February. Putting aside the difficult question of how purchases made *before* the conspiracy are evidence of a common scheme, Apex's presentation of the evidence omits one critical fact that makes an inference of *independent* action from the late January purchases overwhelming: The oil could be purchased at a lower price through a futures contract on the Exchange than it could under existing wet market supply contracts. The witnesses and documents of

both Northeast and Belcher establish that they could get cheaper No. 2 heating oil through a February long contract than from their wet market suppliers. The witnesses from Warren simply could not recall what their rationale was at the time of purchase. This omission is probative of nothing, particularly in light of the reasons given by Northeast and Belcher for their late purchases.

2. *Prior Practice.* In support of a conspiratorial inference, Apex contends that the actions of the six longs in nominating for delivery in the first three delivery days of February and sticking to those nominations was contrary to prior practice in the industry. This deviation from normal practice, Apex implies, when combined with parallel conduct, supports a conspiratorial inference sufficient to survive this summary judgment motion.

Apex argues that while the Exchange rules permitted a nomination for delivery on the first day after the fifth business day of the month, "it was the custom in the industry for the long and short to mutually work out the time, method and place of delivery." Customarily, it contends, the parties would agree to resolve their contracts by EFP or book transfer, a solution which required no immediate physical product. Apex claims that despite being short on 2,048 contracts for December 1981 and 4,612 contracts for January 1982, it had no problem making delivery by mutual agreement. In fact, an Apex witness estimated that one-half to two-thirds of the deliveries made by Apex in prior months had been resolved by book transfer. Apex further argues that in contracts for delivery in December 1981 and January 1982 none of the long defendants concentrated their nominations early in the month and, in fact, spread them "reasonably throughout the month."

The long defendants do not dispute Apex's characterization of their behavior as to December 1981 and January 1982 contracts. Instead they contend that Apex has inaccurately stated the custom of the industry and ignored basic economic incentives that distinguished their behavior in other months from that in February.

The price at which a long purchased February heating oil in 1982 was fixed at the time of contract formation. Thus, by the time the delivery phase was reached at the close of trading on January 29, the longs had locked in a price for their oil. This situation is critical in light of two undisputed facts: the wet market price for No. 2 heating oil was *falling* in February 1982 and this was a predictable market response as the heating season drew to a close. The price of *March* futures, known in January and February, clearly signalled the resulting natural price drop.

To a long holding a right to receive oil at a fixed price, the falling market created a powerful incentive to receive the oil and resell it before the market price fell too far. Apex's own expert has testified that in a falling market oil is most valuable to a trader at the beginning of the month, before its price slides further. Common sense dictates that if one must take the oil at some point in a month, it is most desirable when it is most valuable. Thus, in a *rising* market month, a long would naturally seek to defer receipt and avoid storage costs while watching the value of his oil rise. In a *falling* market, however, a long would take the oil and incur storage costs in the hope that these costs would be more than offset by the early sale of the oil before its price fell too far below the price paid for it through the futures contract. For example, Warren estimates that every day that receipt of its 155,000 barrels from Apex was deferred represented a decline in resale value of over $10,000, or $300,000 per month. In contrast, storage of the oil would only cost between $31,000 and $46,500 per month. The incentives speak for themselves.

This analysis highlights the fallacy of Apex's argument from prior behavior. It is undisputed that in the months of December 1981 and January 1982—peak heating months—the price of heating oil was *not* falling, but rising. Thus, the economic forces at work in February differed from

those in prior months and make comparison inappropriate. On the other hand, although the March 1982 contracts were subject to slightly different delivery rules, the pattern of nominations there is instructive. In that month, 41% of the long contracts were nominated for the first two delivery days, compared with 29% for February. Even if one controls for the fact that the March rules provided for a five day delivery "window" and the ultimate resolution of the 41% nominated is unknown, March 1982 contract delivery nominations vary significantly from those in December 1981 and January 1982 and are more consistent with the February 1982 early nominations.

The long defendants have also offered two other substantial reasons for early nomination in February which Apex's proof does not put into issue. The defendants contend some barge companies in New York Harbor were faced with a barge strike in 1982, which in early February created an incentive to seek early delivery. Additionally, representatives of Northeast testified that they intended to move oil to their New England facilities from New York and were concerned about delays due to ice and weather conditions.

Apex's attempt to demonstrate that past practice and market custom required the longs to be flexible and to accommodate short desires to defer delivery is unconvincing. By Apex's own admission, February 1982 cannot be compared with February of 1981 or 1983. There is, then, no benchmark to measure "past practice" or "market custom" in a market like that of February 1982. It is also probative that other non-defendant companies nominated large portions of their long positions for the first three delivery days of February 1982. Thus, apart from offering the conclusory statements of several market participants that "flexibility" was the practice, Apex has not demonstrated that there existed any custom or practice from which the parallel nominations of the longs in February 1982 and their insistence on those nominations was a departure and thus capable of a plausible conspiratorial inference.

It should be noted at this point that Apex has sought to control the terms of debate by lumping the individual defendants together as a monolithic group of parallel actors. Yet, the so-called conspiratorial nominations by the six longs vary greatly by date, time and method of delivery. *See* the chronology of nominations, *supra.* Also, the longs reacted differently to Apex's overtures for flexibility. The Exchange minutes record that one broker reported: "Warren is flexible. Belcher is inflexible, but nowhere near as inflexible as Global. Global has [a] suit pending against Apex and will not be willing. They are out to bust them." Warren, in its separate reply brief, argues strenuously that it resolved its contracts with Apex amicably and without extraction of concessions.

In considering the proffered evidence intended to elevate proof of parallel action into the realm of conspiratorial inference, the Court is mindful of another controversial, but entirely lawful, incentive facing the longs. As discussed, there were serious, factually rooted rumors in the market in early February 1982 that Apex did not have enough oil to meet its obligations.

The fact that Apex might be caught without supply in the first delivery days of February presented the astute long with a possible opportunity for economic gain at Apex's expense. By nominating early and demanding delivery, an individual long stood to gain buy-out concessions or default penalties from a strapped Apex. Unless the product of concerted action, such activity is not an antitrust violation. The ability to lawfully seize an opportunity for gain, at the expense of another, is the soul of a free market. The desire to "get Apex" or "take advantage" may not be the stuff of Sunday school, but it is an engine of the marketplace. Even if each long suspected or knew the others were also moving to take advantage of Apex's shortfall, an inference of conspiratorial action does not arise without additional evidence of agreement. *Modern Home*, 513 F.2d at 110.

3. *Lack of Need.* Apex argues that the longs' lack of need for the oil is evidence of their conspiratorial action. Any analysis of this claim is closely related to that of economic incentives above. Apex's evaluations of need, even when construed in the most favorable light, simply do not tend to exclude an inference of independent action. In short, Apex's contention is that the longs demanded delivery solely to extract buy-out concessions from the oil-strapped Apex. Assuming for the moment that "need" can be defined at all in a highly liquid marketplace where traders, speculators, and marketers are all seeking a profit, the fact that several longs acted to gain at Apex's expense does not, standing alone, tend to exclude the competing inference of independent action.

If Apex had no oil in place at GATX in early February, a single long would be able to demand concessions by sticking to delivery whether or not the others did likewise. And each long might well have expected that other smart business people would do the same, but this consciously parallel behavior does not infer conspiracy where the individual long would have the identical motive to demand delivery whether or not he had conspiratorial bedfellows. *See Modern Home; Hunt,* 465 F.Supp. 195.

The preceding discussion, of course, assumed that "need" has a meaningful definition in a market of this type. In fact, it does not. A rational economic actor always has "need" for value. In early February, even a long who had no waiting buyer for the oil could reasonably conclude that the oil in a falling market was worth more early than late, even if storage would be necessary. When it is recalled that a long could also expect value in the form of a buy-out premium from Apex, the "need" for the oil becomes self-evident. Thus, Apex's statement that "Absent a need for oil early in February, it was contrary to the economic interests of the long defendants to seek early delivery" is nonsensical.

4. *Motive.* Motive evidence in this case does not tend to exclude an inference of independent action. Apex is certainly correct in its assertion that the longs had a motive to conspire to nominate early, demand delivery, and restrict Apex's access to oil supplies in New York Harbor; the identical motive, however, also supported individual action. Either way, they stood to reap enormous gains from a squeezed Apex. Thus, in this case, motive provides no inference of conspiracy. Given the market conditions in early February, even a long with the most malevolent of intentions had the same motive to act alone or in concert in demanding delivery. In both cases, he stood to get oil at the point in time when it was most valuable to him or receive a premium buy-out from Apex.

Apex has also argued that the long defendants were motivated by greed and animosity towards Apex. It offers a hearsay statement by Raber that DiMauro expressed his hatred for Apex. Apex's counsel has employed the word "greed" to imply nefarious conduct by the defendants. It must be emphasized that greed may be an unsavory personal characteristic, but it is also at the heart of an active and free market where more disinterested observers might call it "profit motive." As discussed above, however, it is not unreasonable to infer that the longs harbored some animosity toward Apex and that the market conditions in early February may have presented an opportunity to recoup some of the January profits Apex had earned in the zero-sum game of commodities trading. Additionally, an Apex default could result in the award of penalties, which would be paid both to the Exchange and the victimized long.

Thus, while Apex has established that the longs had ample personal and financial motive to "get" Apex, this motive evidence fails to negate an inference of independent non-conspiratorial action. Courts have traditionally been reluctant to grant summary judgment in antitrust cases because issues of motive are often central, with credibility being a key issue. *See Poller.* But in a case such as this, motive is not a delicate factual issue because a long stood to gain

either by acting alone or by acting in concert.

5. *Interfirm Communications.* Apex contends that there existed a high level of interfirm communications in this case which, together with the parallel conduct of the longs, supports an inference of conspiracy. Courts have held that a high level of communications among competitors can constitute a "plus factor" which, when combined with parallel behavior, supports an inference of conspiracy. *See, e.g., In re Plywood Antitrust Litigation,* 655 F.2d 627, 633–34 (5th Cir.1981), *cert. dismissed sub nom. Lyman Lamb v. Weyerhauser,* 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983); *Gainesville Util. Dep't v. Florida Power & Light Co.,* 573 F.2d 292, 301 (5th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). However, detailed analysis of the evidence presented by Apex in "shotgun" fashion reveals the inadequacy of these allegedly probative communications.

Apex's use of evidence of interfirm communications is marked by a persistent and troublesome element of circularity. Its entire presentation implies that the interfirm communications cannot be considered natural responses to common concerns, as in *Hunt,* because here the "common concern" —threat of default—was actually *caused* by the concerted effort of the longs in nominating early. Apex, the argument seems to go, would not have been in a tight spot if there had been no conspiracy; therefore these conversations are actually a response to the successful achievement of the conspiratorial objective—a "crunch"— and actually constitute further evidence of the conspiracy.

But this argument has it backwards: it assumes a conspiracy first, and then sets out to "prove" it. Under *Weit,* 641 F.2d at 461, once faced with uniform sworn denials from the defendants, Apex is required to supply evidence which tends to establish a conspiracy. It may not proceed by first *assuming* conspiracy and then explaining the evidence accordingly. If Apex can present independent evidence which tends

to exclude an inference that the longs acted independently, then, and only then, may it use these conversations for whatever additional evidence of conspiracy they may provide. Until it can do so, these conversations are at best ambiguous.

a. *Denihan (Northeast)—DiMauro (Triad).* On February 1, Dennis Denihan of Northeast spoke to Sal DiMauro of Triad. Apex contends that "[i]t may reasonably be inferred that Denihan transmitted to DiMauro the information as to the short position of Apex" because Wahl of Apex had told Denihan of Apex's position on Friday, January 29.

No evidence of conspiracy may be gathered from this conversation. Sal DiMauro and Triad were brokers for Northeast (as well as other of the longs) for wet market transactions and Denihan testified that *wet* market transactions were discussed. It is simply not reasonable to assume Denihan told DiMauro of Apex's short position and no basis for such an assumption has been provided. In any case, if Wahl of Apex was telling people of Apex's position, it could hardly be evidence of conspiracy if Denihan had told his broker.

b. *Beberich (Belcher)—Oliver (Northeast).* Apex alleges that on February 1, Berberich of Belcher spoke to Oliver of Northeast. There is, however, no admissible evidence that this conversation ever took place. The only proof of the conversation is a hearsay reference to Oliver's name in Berberich's notebook. Neither individual could recall the conversation.

c. *Berberich's Notes.* The alleged conversation between Oliver and Berberich is important to Apex, however, because Berberich's notebook for February 1 also contains the words: "demand delivery", "look for default", and "Merc EFP". Apex seeks to establish that Oliver spoke to Berberich and communicated the information about Apex's short position that Oliver's co-worker, Denihan, had obtained from Ed Wahl of Apex. That complicated equation would establish a link between communications about Apex's short position and Berberich's notes. The chain

Apex seeks to construct is improper. There is *no* admissible evidence that Berberich spoke to Oliver, much less that he and Oliver discussed Apex and Berberich later memorialized the conversation in his notes. To infer the contrary is sheer speculation.

On February 1 Berberich also wrote in his notebook: "Saturday, demand 12:01 Saturday a.m.," which meant requesting delivery of Belcher's contracts on February 6, the first delivery day. On February 2, Berberich wrote "promote crunch" in his notebook. Construing this evidence in the light most favorable to Apex, it supports an inference that Belcher intended to demand its oil early and put pressure for delivery on Apex. It does not tie Belcher to a *concerted* effort to harm Apex.

At oral argument, Apex's counsel contended that an inference of conspiracy flowed from the small size of Belcher's holdings: How could Belcher be acting alone and hope to promote a "crunch" of huge Apex with only 315 contracts? The fallacy in this argument is that the evidence indicates that Apex had little or no oil available for delivery at GATX on February 6, and it appears the market knew this fact. Thus, even assuming the falling market and its product needs had nothing to do with Belcher's nomination and malevolence was its sole motive, it could "crunch" Apex. By demanding its 315 contracts during the *first minute* of the delivery period, Belcher, acting alone, could reasonably have hoped to unilaterally pressure Apex and obtain default penalties or a premium price buyout. In fact, the basis for Apex's claims against the exchange defendants is that they refused to guarantee nondelivery of a single 300 contract Stinnes nomination slated for February 6. Thus, Apex is saying Stinnes successfully squeezed Apex with 300 contracts while Belcher could not hope to do so with 315. Apex cannot have it both ways. At its worst, Belcher's behavior is as consistent with independent business behavior as with a conspiracy.

d. *Slifka (Global)—Oliver (Northeast).* On February 3, Fred Slifka of Global called Donald Oliver of Northeast. This conversation is evidenced by the notes of Northeast's Denihan, who testified that he made the notes after a discussion with Oliver concerning the conversation with Slifka. The notes read:

*DAO—*

Re Merc Nominations

(1) All nominations in writing

(2) If not accepted NPC to demand $100.00/contract/day penalty for five days

At end of five days window NPC to demand 10 Pct penalty + oil + go to court

(3) NPC to go to newspaper and expose Exchange

(4) All loadings must be GATX

Even assuming Oliver discussed each of these matters with Slifka, this evidence does not tend to exclude the possibility of independent action. If one first assumes a conspiracy, as Apex's presentation does, discussion of these matters seems consistent with a conversation between two conspirators. This evidence, however, does not help to *prove* conspiracy because it does not tend to exclude the inference that the items discussed were a predictable response to existing conditions. While it could be imagined that the longs had conspired to pressure Apex, and Slifka and Oliver were merely discussing the final details of the effort, it is more likely that their conversation was a natural one between traders faced with a common concern: the possibility of an Apex default on deliveries.

Thus, in the face of an Apex shortage, it was not unreasonable for these competitors to discuss matters of common interest. Absent some showing that the content of the communications supports a reasonable inference of conspiracy, a discussion of shared concerns does not a conspiracy make. *Hunt,* 465 F.Supp. at 230–31. Mentions of default rules, written nominations, and threats against the Exchange are all consistent with a fear of default in a month when early barrels were desirable and Apex was short of oil. "All loadings must

be at GATX" *could* mean the longs wanted to keep the pressure on Apex, but it is more reasonably considered innocuous in light of the fact that Apex itself had chosen GATX to make its deliveries. Significantly, Oliver later called Slifka to explicitly *reject* joint legal action by the oil firms against the Exchange. These notes may be Apex's best evidence, but they too are ambiguous and consistent with independent conduct.

e. *Slifka (Global)—Wytrzes (Warren)*. On February 3, Apex contends, Wytrzes told Slifka that Warren had nominated for February 6 and that he had heard that Apex would have trouble making delivery. This conversation is memorialized by the notes of Andrew Wittenstein, an attorney for Global, who made them well *after* the alleged conspiracy terminated. Thus, even if the information in the notes constitutes an admission by Global, it is inadmissible hearsay as to the other longs because it was not made during the course of any conspiracy.

Most importantly, however, the alleged statements by Warren to Global concerning Warren nominations were made *after* Warren submitted its nominations. This makes them significantly less probative of conspiracy than if the conversation had considered nominations before they were made. Any statements concerning Apex's difficulties with delivery were natural considering the information already in the marketplace. This evidence does not support a reasonable inference of conspiracy in light of the competing inference that Warren and Global were acting alone but were faced with a common market crisis.

f. *Slifka (Global)—Berberich (Belcher)*. On February 3, Slifka spoke to Berberich. Apex's version of this conversation is restricted to discussions of whether there would be a default in the market. Again, this discussion of a common concern is simply not evidence of conspiracy. In fact, Berberich admitted that he spoke to other industry members about the rumors of default. As Judge Weinfeld noted in *Hunt*, such behavior is natural in light of the

concerns shared by all long defendants. It is also important that this conversation took place *after* Belcher submitted its nominations, when the concern about default would no doubt be high.

g. *Berberich (Belcher)—Oliver (Northeast)*. Berberich also spoke to Donald Oliver of Northeast on February 3. During the conversation each acknowledged that his company held a long position and had submitted nominations. This is not evidence of any conspiracy.

h. *Costikyan (Belcher)—Oliver (Northeast)*. On February 3 Thomas Costikyan of Belcher called Oliver to ask if Northeast wished to share a barge with Belcher for receipt of oil on February contracts. Oliver declined. Apex observes that Oliver thought the call unusual. Berberich, on the other hand, testified that sharing had taken place before. What is most significant about this conversation, however, is that joint action was explicitly rejected by Northeast; thus an inference of *concerted* action is not supported.

i. *Slifka (Global)—brokers*. Slifka's phone records indicate that on the morning of February 4, he made calls to Triad and TIC. He also called Joel Faber and Jeffrey Atkin, floor brokers through whom Global purchased futures contracts. These individuals were *Global's brokers*. A call to them by Slifka of Global presents no evidence of concerted action.

j. *Slifka (Global)—Belcher*. Slifka's phone bill reflects a call to Belcher on the morning of February 4. This fact alone is probative of nothing.

k. *Slifka (Global)—DiMauro*. Joe DiMauro testified that Slifka called him on the afternoon of February 4 to discuss whether deliveries would be made under the February contracts. Joe DiMauro and his company were brokers for Global. Again, no inference of concerted action is presented by the conversation of a principal with his broker concerning market conditions of concern to both.

l. *Bertolami (Stinnes)—DiMauro*. Apex observes that Vito Bertolami of

Stinnes was in "daily" contact with Joe DiMauro during early February. DiMauro's company was also a broker for Stinnes and communications between the broker and his client are consistent with, and essential to, independent action by the client.

m. *Eastern—DiMauro*. Apex contends that Eastern also "entrusted DiMauro with wide responsibilities for the trading of No. 2 heating oil on its behalf." This was perfectly consistent with independent action; DiMauro was Eastern's broker.

Apex's conclusion from all this is that "there existed a pattern of pervasive inter-firm communications during the crucial time period when the conspiracy was conceived and implemented." The record simply does not support such a statement. Apex no doubt hopes to bring this case within the ambit of *In re Plywood Antitrust Litigation*, 655 F.2d 627 (5th Cir. 1981), *cert. dismissed sub nom. Weyerhaeuser v. Lyman Lamb*, 462 U.S. 1225, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983), where the court found the pattern of inter-firm communication a sufficient "plus factor" to make parallel behavior supportive of a conspiracy inference. In that case, however, the contacts between competitors were not only frequent but also highly probative of conspiracy. The court observed that "[t]he parallel pricing conduct clearly demonstrated in the record plus the numerous items of direct evidence of communication between high-level personnel on pricing policy adequately support the jury's verdict." 655 F.2d at 634. The record there contained many memoranda written by the alleged co-conspirators, explicitly detailing the discussions they had had with each other concerning pricing. As the Fifth Circuit observed, the plaintiffs had "unearthed damaging evidence from the mouths, or typewriters, of defendants' own employees." *Id.* at 633.

In the present case, once the communications between client and broker are excluded—as they must be—we are left with a total of *six* communications, (two of which are of doubtful admissibility), between the six alleged co-conspirator longs, hardly a "pattern of pervasive inter-firm communications". It is significant that *none* of the communications involved Eastern or Stinnes and only *one* involved Warren. Of the six communications, one is represented by a phone bill, one resulted in a rejection of concerted action, and two involved nothing more probative than a discussion of default—a legitimate concern of all longs.

The remaining two items are the conversation between Berberich (Belcher) and Oliver (Northeast) allegedly memorialized in Berberich's notes, and the call between Slifka (Global) and Oliver (Northeast) summarized by the notes of Denihan (Northeast). This is Apex's best evidence. As discussed, however, even assuming these two conversations are supported by admissible evidence, and the notes recording them are construed liberally, they remain ambiguous. Both can support either an inference of conspiracy or an inference of independent conduct; the former does not tend to exclude the latter. None of these inter-firm communications rise to the level of those found probative of conspiracy in *In re Plywood Antitrust Litigation*.

6. *Inquiries at GATX.* The record indicates that in late January and early February 1982, inquiries were made by long defendants about the inventory of oil at GATX, the terminal selected by Apex for delivery under its February contracts. On January 28, Northeast's Houston office told Denihan, of Northeast's New York office, that inventory was low at GATX. On February 3, Berberich (Belcher) called GATX to find out how much oil was there and how much of it was in Apex's name. He learned that GATX held 520,000 barrels and Apex's inventory was negligible. Berberich also wanted to determine who owned the barrels on hand at GATX although he could not recall whether he ever attempted to do so.

These inquiries more plausibly support an inference of independent action than concerted effort. By February 3, Belcher knew that Apex had selected GATX for delivery of Belcher's 315,000 barrels. Berberich's investigation is perfectly con-

sistent with a concern over Apex's ability to supply the oil. There is also no evidence that Northeast's Houston office ever asked for, or received, information about Apex's inventory at GATX. Its inquiries are consistent with a prudent attempt to understand the market supply position, particularly when Northeast held 748 long contracts and there was some question of the shorts' ability to provide oil.

An employee of GATX, Joseph Teleposky, testified that on Friday, February 5, he received telexes from some of the longs stating their intention to pick up oil at GATX the following day. He said that these were unusual. Without more, this parallel conduct is not probative of conspiracy. In light of the threat of default that had emerged by February 5, it would be expected that each long would attempt to ensure that its delivery would be protected. The record reveals other efforts by longs to "dot all i's and cross all t's" in the face of a possible default. It is certainly more plausible that each long hoped to be in a solid position to take delivery or reap the benefits that default penalties would bring.

7. *Threats to Exchange and Clearing Members.* As mentioned above in the discussion of inter-firm communications, the notes of Denihan (Northeast) reveal that his boss, Oliver, and Slifka (Global) talked of suing the Exchange or going to the press. Apex contends further that Northeast and Belcher each threatened their clearing members with legal action if their nominations were not submitted as requested.

The discussion between longs of possible action against the Exchange—not communicated to the Exchange—apart from tending to show that the Exchange was *not* a co-conspirator, does not establish anything save a discussion between two companies faced with similar problems and worried about the enforcement of their contract rights.

Likewise, the threats to sue clearing members are not probative of conspiracy. In fact, Northeast's telex does not threaten its clearing member, but instead advises the member to inform "seller", i.e. *Apex,* that failure to clear nominations will be a serious problem. Belcher did threaten *one* of its clearing members, but in the light of its concern over default, this action is consistent with independent action.

8. *Access to Supply.* As part of its conspiracy claims, Apex contends the long defendants conspired to refuse deals with Apex and to encourage others to do the same. Apex offers three pieces of evidence in support of this assertion:

a. *Stinnes Offer.* On February 1, Triad, Joe DiMauro's wet market brokerage firm, "offered" to sell Apex 300,000 barrels of No. 2 oil immediately on behalf of Stinnes. Apex claims that when its chief trader, Gary Parker, called Sal DiMauro of Triad to express interest in the oil, Sal DiMauro said Stinnes would sell the oil at 87 cents or 87.1 cents per gallon, but he would confirm the offer only after talking to Stinnes. Ten minutes later, Sal DiMauro called Parker back and informed him that his brother Joe had told him the barrels were not for sale. Parker testified that Joe DiMauro said "Sal wasn't supposed to be offering those barrels out for sale."

On February 2, when Wahl of Apex again asked Triad about available barrels, Sal DiMauro said 300,000 were available but at a cost of 97.5 cents per gallon. On February 3, during a meeting with Bertolami of Stinnes, Joe DiMauro called Paul Novelly of Apex and offered to sell Apex 1.5 million barrels of Stinnes oil at 93.5 cents per gallon. Apex declined that offer.

Apex asserts that the contradictory positions taken by Triad regarding the price of the 300,000 barrels is evidence of a conspiracy to deny supply to Apex. Construing this evidence in the light most favorable to Apex, it reveals only that Stinnes realized it would be foolish to sell barrels at a lower price when Apex's shortage indicated that higher prices would be forthcoming. Stinnes had no obligation to assist Apex by selling oil to it at a low price. It is more plausible to infer from this evidence that after its first discussion Stinnes saw that

Apex was in a bind and that it could get a premium for oil, and therefore ceased discussing a sale of 300,000 at a lower price, and later made a larger offer at a higher price.

Again, if, as Apex would like, one first assumes conspiracy, then this behavior may be seen as consistent with unlawful action. But this evidence is not *proof* of conspiracy because any inference of concerted action is unreasonable in light of the competing inference that Stinnes was a smart player in the market and narrowly avoided Sal DiMauro's loss of a profit opportunity.

b. *Amoco.* Through a tenuous chain of inferences, Apex argues that its inability to get oil from non-defendant Amoco to fulfill its February delivery obligations with Apex is evidence of a concerted effort by the defendants to restrict its access to No. 2 oil. Apex had contracts with Amoco for delivery of oil in January through March of 1982 and Amoco was encouraging Apex to take oil in January. Goldman Sachs & Co. told the Control Committee on February 4 that 750,000 Amoco barrels were expected at GATX in time to meet Apex's delivery obligations on February 6. But in early February, Amoco did not deliver the oil Apex expected to use to meet its futures market obligations. Apex contends that Amoco's failure to deliver resulted from the conspiracy.

Apex attempts to tie the long defendants to Amoco through two meals involving principals of Stinnes and Amoco. On January 26, Bertolami and Pat Marcello of Stinnes had lunch with Walt Buri of Amoco. Bertolami's expense vouchers reveal No. 2 oil was discussed. On January 29, Bertolami and Joe DiMauro had dinner with Buri and Dom Olsen of Amoco. Again, the expense vouchers show No. 2 oil was discussed.

Amoco agreed to deliver 400,000 barrels of No. 2 oil to Stinnes in February, with 200,000 barrels to be taken prior to February 5. Stinnes also requested an additional 400,000 barrels on an accelerated basis and sought February delivery of 200,000 barrels due in March 1982.

Apex contends this behavior "suggests" a conspiracy to restrict access to supplies. It does not, however, even rise to the level of a suggestion. Amoco witnesses testified, and Apex has offered no contradictory proof, that *no oil was owed to Apex for early February*. The Amoco-Apex contracts provided that specified amounts of oil had to be delivered in each of the months of January, February, and March, with no delivery dates specified. In this light, the meals involving Stinnes and Amoco hardly bear discussion. Subsequent events bear out that a discussion of No. 2 oil transactions, unrelated to Apex, was probable. There is no inference of conspiracy here. Finally, Stinnes' oil deals with Amoco for February simply show that it needed the oil, a fact that directly undercuts one of the main pillars of Apex's case for conspiracy—lack of need.

c. *Warren and Karam.* Apex argues that the refusal of Warren to participate in a book transfer involving Karam Petroleum Company, Warren, and Apex is evidence of a conspiracy by the long defendants to squeeze Apex by refusing to deal. Warren owed Karam oil, Karam owed Apex oil, and Apex owed Warren oil so the obligations of all three, including those of Apex to deliver to Warren, could be wiped out by book transfers among them. Warren, however, refused to use the oil it owed Karam to offset the barrels owed to it by Apex.

There are numerous problems with Apex's proffer of evidence. First, as noted earlier, Karam himself never said Warren refused to do the transfer because Apex was involved; instead, what Apex has offered is Wahl, of Apex, reporting Karam's report of rumors that Warren was out to get Apex. These statements by Wahl are of little probative value and double hearsay.

Second, the compelling inference in this context is that Warren rejected the book transfer for proper business reasons. Karam owed Warren 15,000 barrels from Janu-

ary and 40,000 prompt February barrels. Prompt barrels were those due and owing immediately. By contrast, Warren owed Karam 40,000 barrels deliverable anytime in February and another 40,000 deliverable during the last two weeks of February. Warren had paid Karam a premium to be able to obtain the barrels early in February and repay them late in February.

Thus, Warren had bargained for, and received, the right *not* to give Karam its barrels in early February and its refusal to do an early February book transfer involving Apex was consistent with this bargain. To do an early February book transfer with Karam and Apex would have been contrary to Warren's economic interest. In fact, Warren's arrangement with Karam shows the value of "early" oil to Warren and the other longs in a falling market and thus demonstrates the innocent purpose behind demanding early delivery in February.

9. *DiMauro and "hold harmless."* On the evening of February 5, Joe DiMauro had a conversation with Gary Parker of Apex on a speaker phone while Ed Wahl and Steve Wirkus of Apex listened. Apex in its brief claims DiMauro "flatly stated that he was acting on behalf of all long defendants" and that "DiMauro further indicated his familiarity with the conspiracy to squeeze Apex but, in denying his own involvement, tried to lay the blame on Sun Trading."

Apex's characterization of this February 5 conversation is highly misleading. It should be noted at the outset that this "evidence" comes from the uncorroborated accounts of the telephone conversation supplied by three Apex participants taken in depositions subsequent to the commencement of this action. The accounts (1) do not purport to be verbatim recitations, (2) contradict each other, (3) are not supported by contemporaneous memoranda, and (4) are flatly denied by DiMauro. Taken in the light most favorable to Apex, the most that can be said is that DiMauro stated he represented Global, Stinnes, Eastern, and Belcher, his brokerage clients, not Warren and Northeast and that whoever was "do-

ing this," it was not DiMauro, but Sun Trading.

Apex tries to shore up its argument that DiMauro was aware of a conspiracy on February 5 by arguing that on February 6, he attempted to obtain a "hold harmless" agreement from Apex on behalf of himself and his clients. Apex's use of the request for a hold harmless is inappropriate for two reasons. First, it is undisputed that Parker threatened DiMauro during their conversation on February 5. Second, Parker, the only Apex employee who heard both sides of the February 6 conversation, testified that DiMauro made the request solely on his own behalf. While Wahl and Wirkus evidently felt differently, Parker, the only person on the Apex end of the phone, did not understand DiMauro to be seeking a "hold harmless" on behalf of any long. These two facts support a strong inference of independent, and prudent, action by DiMauro in seeking a "hold harmless" agreement for himself.

10. *Inventory Transfers.* Apex argues that the nominations by Warren and Global for inventory transfers at GATX when neither company had storage there is evidence that the long defendants pressured Apex and drove up the price of oil. It is true that Warren had no agreement with GATX in February 1982 for storage. Two Apex witnesses testified, however, that spot storage was available at GATX and not unusual. Inventory transfer would not require separate storage space. Wentworth of Warren testified that Warren would usually wait to arrange spot storage until it was certain storage was needed. Taking the oil by inventory transfer also made sense for a New York area trader such as Warren because the nomination could be passed to others at GATX, thus saving transportation costs. In any case, as Atkin told the Control Committee, Warren was flexible as to delivery, and in fact ultimately did agree to defer delivery and take the barrels by book transfer. Warren's conduct is consistent with independent, rational business behavior.

It is also true that Global had no regular storage space at GATX and no significant marketing operations in New York. Global, however, often traded in New York, and leased storage space. Slifka of Global testified that he arranged to lease some of Stinnes' storage space when he learned from his broker, DiMauro, that it was available. There is nothing in this activity that supports an inference of concerted action.

11. *Vessel Nominations.* Apex contends that an inference of conspiracy can be drawn from the designation by Northeast of vessels that would not be available at GATX at the appointed times. None of this evidence is probative of conspiracy.

a. *AMERICAN HAWK.* On February 2, Northeast nominated to take 200,000 barrels of No. 2 oil aboard the tanker American Hawk on February 8 at 8:00 a.m. Apex observes that the tanker needed to discharge ballast before receiving oil, but GATX could not receive pumped ballast. Denihan's notebook also reflects that the barge would not be in New York until noon on February 8 and Northeast never amended its nomination to reflect this change.

There are two problems with this evidence. First, the record indicates that the American Hawk's ballast could have been pumped at sea onto another barge. Second, Denihan's notebook entry is ambiguous, but even if construed as Apex urges, it is not probative of conspiracy. The Exchange rules provide that Northeast could have changed its nomination to receive the oil on the AMERICAN HAWK when it was ready to load. Even assuming Denihan knew the barge would be late, a four hour delay in 200 out of 748 contracts is hardly suspicious, no less probative of conspiratorial behavior. Certainly Northeast could also have told Apex of the delay before February 8. This never came to pass, however, because Apex and Northeast settled on February 5.

b. *SONAT 81.* Denihan's notebook reflects that the SONAT 81 barge, nominated to pick-up Northeast oil on February 10, 1982, was to leave Northeast's system on January 30, 1982. Apex contends that be-

cause the barge was given back to Sonat, its nomination for February 10 was bogus and suspicious. This nomination was not only outside the "window" of conspiracy, which Apex represented at oral argument to have ended on February 8, but Northeast also settled with Apex on February 5, thus obviating the need for the barge. There is no evidence in the record that the barge could not have been chartered for February 10. Indeed, an employee of Sonat testified that the barge was available on short notice.

c. *INTERSTATE 70.* Charles Rose, of Sonat, testified that the INTERSTATE 70 barge could not make the three round-trips between GATX and New Haven, Connecticut within the time-frame of Northeast's nominations. Mr. Rose's qualifications to comment on the ability of a barge to make round trips between GATX and New Haven are unclear. Nor is it clear what hypothetical facts he assumed. But even if the Rose testimony is taken at face value, it is probative of little other than that Northeast's schedulers were less than perfect. The three scheduled pick-ups at GATX were for February 6, 8, and 10. As noted, any nominations for delivery after February 8 would occur after the alleged conspiracy. The fact that in scheduling the INTERSTATE 70 pickup on February 8 Northeast might have overestimated the barge's speed in making the New Haven run is not evidence of conspiracy.

In a strange twist, Apex also asserts evidence of conspiracy arises from the fact that Belcher paid to hold the OCEAN 262 on standby from February 2 until February 5, when it settled with Apex. While Belcher witnesses admitted that this was unusual, it is consistent with the possibility that the barge might have been needed to take delivery and is not probative of any conspiracy. Thus, we see Apex offering as evidence of unlawful action *both* the failure to have barges available by Northeast *and* the maintaining of a ready barge by Belcher. This contradiction speaks for itself.

### (5) *Overview*

■ The detailed review of each piece of evidence in this case was essential because of the amount of material presented by Apex. When faced with that mass of material, offered in an amorphous manner, there is a strong temptation to conclude that "something" illicit must have gone on. Even innocent explanations of each individual piece can seem somehow suspicious when a mountain of material must be confronted. Matters are further confused by the fact that many of the actions and statements by defendants would make sense in the context of a conspiracy. They do not, however, tend to *prove* a conspiracy. They are equally consistent with independent non-conspiratorial action. Apex's presentation of this case depends on the hope that it can seize the high ground and start from a premise of concerted action. The law, however, requires that, once met with sworn denials from the defendants, *Apex* must demonstrate a material issue of fact by supplying significant probative evidence tending to exclude an inference of independent action. As the Supreme Court made clear in *Interstate Circuit*, denials under oath by the alleged conspirators present a major hurdle to any antitrust plaintiff. The inference of conspiracy found in *Interstate Circuit* was due in part to the *failure* of the principals of the defendants to deny their involvement. 306 U.S. at 225–26, 59 S.Ct. at 473–74.

■ Similarly, Apex may not prove conspiracy by hearsay admitted under a co-conspirator exception without first establishing the existence of a conspiracy by independent non-hearsay evidence. Again, Apex may not presuppose a conspiracy and work backwards. An illustration of Apex's attempt to turn the case on its head, is the argument by Apex that the disparity among nomination dates, times, and delivery methods "only goes to establish what a skillfully thought out conspiracy it was...." This type of "Catch–22" reasoning is plainly inappropriate. In fact, there is not a scintilla of evidence that any longs jointly considered the details of their individual nominations.

DiMauro is the focus of Apex's attention because, as a broker for Global, Stinnes, Eastern, and Belcher, he is the closest thing to a link between the longs. "Yet, the mere opportunity to conspire, even in the context of parallel business conduct, is not necessarily probative evidence." *Weit*, 641 F.2d at 462. There is no probative evidence of DiMauro's participation which tends to exclude the inference that he was simply present and acting as a broker for his clients.

When the evidence in this case is taken piece by piece, it does not add up to a triable case because the sum of zeros is still zero. Viewed as a whole, the case also fails to supply an inference which is reasonable in light of the powerful inference of independent response to existing economic conditions. At its best, the evidence offered tends to establish that each long defendant, matched with a short without product in a month of falling prices, decided that it stood to make the most profit by demanding its oil in the first three delivery days of February 1982: Either prompt and valuable oil would result, or a premium buy-out with possible default sanctions against Apex would be gained. This business decision, which lies at the heart of the long defendants' actions, does not require, nor does it imply, a conspiracy.

Accordingly, summary judgment is granted to the long defendants on Claims I–IV.

### COMMODITIES MANIPULATION: CLAIM V

Apex's fifth claim alleges manipulation of the futures market for No. 2 oil in violation of the Commodity Exchange Act ("the Act" or "CEA"), 7 U.S.C. § 13(b), which makes it unlawful:

> for any person to attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any contract market ... or knowingly to deliver or cause to be delivered for transmission through

the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce.

Section 13c(a) of 7 U.S.C. imposes liability as a principal on any person: (1) "who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions" of the Act; (2) "who acts in combination or concert with any other person in any such violation"; or (3) "who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions" of the Act.

Apex's claim under the CEA has two elements. First, it alleges that the long defendants manipulated the futures market for No. 2 oil in February 1982 by creating or exploiting a "squeeze" and forcing Apex to purchase oil at inflated prices. Second, Apex alleges that the long defendants communicated false reports in violation of the CEA. (Although the amended complaint includes the exchange defendants within the claim of manipulation, Apex has not argued that Raber or the Exchange were party to any manipulation.)

### 1. *Manipulative Scheme*

Apex's claims for manipulative activity under the CEA are virtually coextensive with those for conspiracy. Specifically, Apex alleges that the defendants unlawfully manipulated by:

—conspiring to nominate for early delivery of their No. 2 oil, with knowledge that Apex could not physically satisfy the nominations;

—limiting Apex's access to No. 2 oil in New York Harbor during early February;

—conspiring not to deal with Apex for No. 2 oil in the first week of February; and

—agreeing not to modify their delivery nominations.

Apex contends that these activities violated Section 9(b) of the CEA because they constituted conduct "intentionally engaged in which resulted in a price which does not reflect basic forces of supply and demand", *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir.1971), *cert. denied sub nom. Cargill, Inc. v. Butz,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972), and that the long defendants acted together to either create, or unlawfully take advantage of, a "squeeze" on Apex. A "squeeze" is characterized in *Cargill* as a situation where "deliverable supplies of the commodity in the delivery month are low, while the open interest on the futures market is considerably in excess of the deliverable supplies." *Id.* at 1162. For a manipulative "squeeze" to be created, however, "market dominance" by the defendant or defendants is needed because "a squeeze cannot be successfully executed unless a long has sufficient control of enough futures contracts to force the shorts to come to him to settle their contracts." *Id.* at 1164.

There is considerable dispute in this case over the existence of a squeeze, the causes of the squeeze if one existed, and the market dominance of the accused longs. But since it is not disputed that no individual long alone possessed "market dominance," Apex must rely upon concerted action to prove a manipulation. Thus, the Court need not reach difficult questions of intent, market condition and market dominance that have troubled courts in manipulation cases. Apex has failed to present evidence that raises a material issue of fact as to a conspiracy to do *anything* among the defendants. *See* antitrust discussion, *supra.* Without a conspiracy, there can be no manipulation in this case and, therefore, summary judgment must be granted to the long defendants on that portion of Claim V alleging unlawful manipulative activities.

### 2. *False Reports*

Apex asserts the long defendants are liable under the CEA for proliferation by them and their brokers of "false or misleading or knowingly inaccurate reports." Apex, however, has failed to supply even

the rudimentary details of the evidence upon which it bases this claim. The specific statements have never been cited by Apex or supported by admissible evidence, nor has Apex explained the relationships between the long defendants and any speaking brokers. Apex has not demonstrated who made what statements on whose behalf. In a brief footnote, Apex merely asserts that the "misrepresentations made on behalf of one of the long defendants are binding on all of the participants in this conspiracy. *Pinkerton v. United States*, 328 U.S. 640 [66 S.Ct. 1180, 90 L.Ed.2d 1489] (1946)." By once again lumping evidence and defendants together, Apex apparently hopes that the Court will *assume* something nefarious must have taken place. There are, however, numerous problems with Apex's approach.

The first difficulty on this "reports" claim arises because Apex has not raised a material issue as to conspiracy. Thus, the Court cannot treat the remark of one long or one agent as binding all co-conspirators. Instead, the Court is left without any framework in which to evaluate the alleged statements: Not only have no actual statements been presented by Apex, but also there is no way to determine on whose behalf any brokers made statements.[2] This is a critical failing because, in addition to claiming that some longs themselves made statements, Apex relies on two alternative theories of liability to hold the longs for remarks by brokers: aider and abetter liability under Section 13(a) of the CEA, and traditional agency principles. Thus, in the absence of a conspiracy, the Court is unable to analyze these claims in any meaningful way and Apex has therefore failed to demonstrate a genuine issue of material fact as to liability for any false reports or statements.

■ Even assuming (1) specific statements, (2) by specific actors, (3) tied factually and legally to specific defendants, Apex's claim of manipulation by false statement must fail. Taking the alleged unlawful statements from Apex's answers to contention interrogatories, they may be organized into four general categories: "Apex does not have the oil," "Apex could not make delivery," "Apex would default," and "Apex was going to get their's." Even if these types of statements are somehow considered "reports" involving "interstate commerce," they are at most rumors, predictions, and opinions characteristic of a vibrant futures market and could easily have been prompted by legitimate concerns about Apex's ability to meet its obligations on the February contracts. In the context in which they appear, they are not actionable misrepresentations.

Without addressing how the foregoing statements could be actionable, Apex asserts broadly that "false statements are actionable misrepresentations when they are made in bad faith or with intent to deceive." Even assuming such statements as these to be actionable if made with the requisite malicious intent, Apex has proffered no evidence of that intent. Conclusory allegations are plainly insufficient at this stage of the litigation. Summary judgment is required on this portion of Claim V as well.

## FAILURE TO REGULATE: CLAIM VII

### (1) *Introduction*

Apex claims the Exchange and Raber violated the CEA, 7 U.S.C. §§ 7(d) and 7a(8), by failing to remedy the market manipulation by the longs in February 1982. It contends that, with knowledge of the manipulative conspiracy, they chose not to exercise statutory authority to preserve a fair market and help Apex. This behavior was allegedly intended by the Exchange "to protect its own self-interest and the self-interest of its vice chairman, defendant

---

**2.** In a disingenuous footnote, Apex asserts: "At least for purposes of this motion, the existence of these false or misleading statements has been conceded. *See* Long Defendants' Statement Pursuant to Rule 3(g), ¶ 79." Apex mem. at 157

n. 6. That 3(g) statement, however, simply summarizes Apex's contentions concerning the statements. It does *not* concede the existence of the statements.

Raber," and avoid a "loss of investor confidence."

Apex's claim for failure to regulate under the CEA faces a major hurdle which it has failed to surmount. Only bad faith conduct by the exchange defendants is actionable under the CEA. Bad faith arises "when self interest or other ulterior motive unrelated to proper regulatory concerns is alleged to constitute the sole or dominant reason for the exchange action ... even though the action was not beyond the bounds of reason." *Sam Wong & Son, Inc. v. New York Mercantile Exchange,* 735 F.2d 653, 677 (2d Cir.1984). Apex has the burden at trial of proving this bad faith. Since the exchange defendants have denied any such behavior and point in their briefs to the absence of any factual issue, Apex must demonstrate the existence of a genuine issue of material fact as to whether the exchange defendants acted in bad faith. Since Apex has failed to do so, summary judgment must be granted in favor of the exchange defendants.

### (2) *Facts*

At the risk of some repetition, it is worth setting forth separately those facts applicable to the exchange defendants' motion.

The Exchange's first involvement in the market crisis came on February 3, when floor broker Jeffrey Atkin told the Exchange's Control Committee (the "Committee"), chaired by Richard Helfer, that "he had learned from industry sources that Apex did not have oil to deliver to his customers," and that "one or two of his customers were out to get Apex." That same day, Apex's clearing member, Goldman Sachs, assured the Committee that Apex would have oil available to keep GATX pumping continuously for several days.

Coincidentally, on February 3, 1982 the Exchange's board of governors also met to approve revisions in the delivery rules for No. 2 oil contracts. The new rules had three provisions that Apex considers significant. First, they would allow longs to designate a five day period, or "window,"

during which delivery would be effected. Rule 150.09(A)(2)(f). Second, the new rules would require all longs to give shorts 72 hours notice of any proposed delivery. Rule 150.09(A)(3). Third, the rules would permit shorts who were unable to clear delivery by the original delivery method to submit revised delivery instructions. Rule 150.09(A)(4)(b).

In a memorandum to the Commodity Futures Trading Commission accompanying the proposed rules, the Exchange governors wrote that the new rules "formalize the Exchange's current delivery procedures." From this Apex argues that the Exchange was aware that mandatory early delivery on a futures contract was contrary to existing practice.

The Committee met again on February 4 with a new acting chairman, defendant Raber. Helfer had stepped down on advice of counsel because one of his clients on the Exchange held a futures position for No. 2 oil in a later month. Raber, a metals trader, had no relation to No. 2 oil contracts. It was at the February 4 meeting chaired by Raber that Goldman announced Apex had 750 contracts coming from Amoco to GATX and another 400 contracts owned by, or owed to, Apex at GATX. By this time, the Committee knew that longs had nominated 657 contracts for February 6, 50 for February 8, and 70 for February 10.

Later on February 4, the Committee met again to hear Goldman state that the Amoco oil had been held up, but would be at GATX on February 5 or 6. Goldman was informed by the Committee that assurances were needed by February 5 that the oil would be in place. After the Goldman presentation, the Committee and its staff met with clearing members representing longs matched with Apex. Timothy Bishop of Apex was also contacted and told of the seriousness of the situation and the possibility of penalties. The Committee then sought to verify the nomination dates submitted by the longs and determine whether there was any flexibility as to the dates requested.

The notes of Committee member and Exchange Vice President for Compliance Patrick Thompson reveal that at the February 4 meeting the Committee considered the declaration of an emergency, the fixing of a price by the Exchange, or the changing of delivery times and sites. None of these measures were adopted.

On February 5 the crisis deepened when Goldman announced to the Committee that the "[p]roblem is worse than we thought last night." Goldman stated that it had told Apex to "get moving to talk with actual longs to work out flexibility." Goldman told the Committee that only 127 contracts could be ready at GATX and, later that day, that Apex could actually deliver only 60 to 85 contracts at the terminal, and the Amoco oil would *not* be available for February 6, 7, and 8.

On February 4 and 5, the Committee also met with clearing members representing longs matched with Apex and urged them to change delivery times and sites. The Committee told both the long clearing members and Goldman that "if it [were] determined that any clearing member, long or short, intended to defame or cause intentional problems to the Exchange and the commodity industry as a whole, the Exchange will bear down on that clearing house."

By the close of business on February 5, all Apex contracts nominated for delivery on February 6 had been resolved except one 300 contract nomination by Stinnes through its clearing member, Conticommodity Inc. ("Conti"). Edward O'Shaughnessy, an employee of Conti, appeared before the committee on February 5 to discuss the nomination but told the Committee he had no authority to resolve it. Instead, he referred the Committee to TIC, Stinnes' broker for the 300 contracts.

Raber asked O'Shaughnessy to arrange a meeting between himself and a representative of TIC so that Raber could discuss the outstanding 300 contract nomination. Raber agreed to meet defendant DiMauro, President of TIC, that evening at the Market Bar restaurant in the lobby of the World Trade Center, downstairs from the Exchange offices.

Both Thompson and Helfer were opposed to such a meeting. Helfer told a meeting of Committee staff members and Raber that he "could not condone anything that [was] being done at that point." According to Thompson, Helfer angrily added that "You are all going to jail, you can't do this ... these people are taking us to the cleaners and you are going to jail if you agree to what they are trying to make you do.... You know what is going on around here, they are making people pay 97 cents for oil." Helfer then wrote out the following statement which he asked Raber to sign: "Please be advised that Richard Helfer bears no responsibility for any decision made on behalf of the Control Committee regarding difficulties concerning the delivery of the Feb. 1982 heating oil contract." After Raber signed the paper, Helfer left.

Raber met with DiMauro at the Market Bar restaurant. Both testified that Raber urged DiMauro to work out the nominations with Apex and told him that default was in no one's interest. After the meeting with Raber, DiMauro spoke with Parker of Apex to discuss possible resolution of the 300 contracts nominated for February 6, the next day. Their discussion was hostile and unproductive.

Also on February 5, Goldman raised technical objections to the Stinnes nomination with the Exchange. It claimed the nomination was invalid because (1) on February 4, when the nomination came in, the Exchange told Goldman not to worry about it; (2) the inventory transfer method of delivery requested was not a recognized method under the Rules; (3) Stinnes had failed to "confirm the availability of the method of delivery from the seller" prior to filing its delivery instructions.

That same evening, at a meeting of the Committee, Raber spoke to O'Shaughnessy of Conti. O'Shaughnessy testified that at one point during the meeting, Raber exclaimed something similar to: "I don't give a F— about you, all I care about is the

exchange and my son coming into my business."

The Committee's discussion of the 300 contract nomination continued until after midnight on February 5. Seevers of Goldman testified that the Exchange told Goldman that resolution would be deferred until Monday, February 8. Seevers called Apex and told them no delivery on the nomination would be required over the weekend.

Rosemary McFadden of the Exchange testified that on Saturday morning, February 6, Richard Leone, President of the Exchange, notified Daniel Amstutz of Goldman that if the 300 contract nomination was not satisfied that day and the Exchange denied the objections on Monday, February 8, the Exchange might determine that Apex had been delinquent and was subject to penalties. McFadden herself called Bishop of Apex on Saturday and told him that "the delinquency clock could be running." Applicable penalties included: (1) a delinquency penalty of $100 per contract per day (up to five days) to be paid to the opposite party, and 10% of the contract value per day (up to five days) to be paid to the Exchange; and (2) liquidated default damages payable to the opposite party of 10% of the contract value. Rules 150.-15(A)(2)(a)(b), (B)(2). On February 6, Apex settled with Stinnes by entering into an EFP at a price of 97.5 cents per gallon. *Both* Apex and Conti were left angry with the Exchange.

Apex claims that the evidence demonstrates that the Exchange and Raber were aware of a conspiracy against Apex. Notes that Patrick Thompson made at the Committee meeting of February 5 contain the word "longs" beside the word "collusion." As discussed above, Patricia Lyons of Apex recorded that Raber told her on February 10 that he was aware of a "conspiracy (Lyons' term) to 'squeeze the shorts.'" Finally, in a memorandum dated February 17, Apex employee Bryant Foster reported that on February 10, Raber used the words "sting," "collusion," and said some longs had been "out to get Apex."

### (3) *The CEA Claim*

Apex must come forward with evidence tending to prove not merely that the Exchange and Raber erred or even acted in part from some improper motive, but that "self interest or other ulterior motive unrelated to proper regulatory concerns" was the "sole or dominant" reason for their actions. *Wong,* 735 F.2d at 677. As the late Judge Friendly pointed out in *Wong,* "if the governors sincerely and rationally believe their action is in the public interest, there should not be liability simply because the action has the incidental effect of advancing their private interests or damaging someone whom they do not like." *Id.*

Apex appears to level the following charges against the Exchange and Raber:

(1) The Exchange acted in pure self-interest to avoid a loss of investor confidence like that which accompanied the 1976 "Potato Fiasco" which self-interest gives rise to an inference of bad faith;

(2) Raber exhibited his bad faith when he made a statement that could fairly be construed as declaring that his actions were based on a desire to preserve his business and ensure that his son would inherit it;

(3) Raber and the Exchange, with knowledge of the conspiracy to squeeze Apex, refused to interpret the rules to allow Apex to defer delivery and thus contributed to the manipulation; this refusal was so irrational as to give rise to an inference of bad faith.

While it is true that "'bad faith' cannot be defined with mathematical precision and an ultimate definition depends upon the facts and circumstances of a particular case," *Mitchell v. Hercules, Inc.,* 410 F.Supp. 560, 568 (S.D.Ga.1976), the facts recited above amply demonstrate that Apex has failed to raise any issue as to whether bad faith was the sole or dominant motive of either the Exchange or Raber in the first week of February 1982. We turn to each claim.

(1) *Investor confidence:* This allegation does not merit lengthy discussion. Action to preserve investor confidence is

action to preserve the integrity of the marketplace and is in the public interest. The mere fact that the public interest and the Exchange members' interest are parallel does not support an allegation of bad faith: "Should a governor vote in favor of ... a rule in the belief that the rule serves the public interest, even if also in the expectation and hope that it would serve his personal interest, his behavior would not give rise to liability." *Bishop v. Commodity Exchange, Inc.*, 564 F.Supp. 1557, 1562 (S.D.N.Y.1983). Here, the exchange defendants could not maintain investor confidence in the Exchange and its market without also maintaining the value of their interests in the Exchange: "If such a degree of self-interest were allowed to demonstrate bad faith, then Exchange board members involved in futures markets would inevitably be subject to bad faith charges and the concept of Exchange self-regulation would be undermined." *Wong*, 735 F.2d at 672.

It is also significant that once Governor Helfer wisely stepped aside, no member of the Control Committee had a personal stake in any heating oil contracts. Thus, the bad faith claim is even weaker here than in *Wong*, where the exchange governors were alleged to have a personal interest in the contracts at issue.

(2) *Raber:* The much-quoted Raber statement that "I don't give a F— about you, all I care about is the Exchange and my son coming into my business," is not inconsistent with action to protect the public interest. The fact that the statement was made to representatives of the longs and not Apex is further evidence of Raber's desire to protect the marketplace. In a memorandum of questionable admissibility, Bryant Foster of Apex recorded that Raber also stated he had chosen not to convene a meeting of the Exchange Board of Governors because he hoped to avert any action which would trigger default and a repetition of the fiasco the Exchange had experienced in the potato futures market in 1976. These facts, if true, do not create a genuine issue as to whether Raber was prompted by an ulterior or self-interested

motive that was inconsistent with action taken in the public interest.

(3) *Irrationality:* Apex's fall-back position on bad faith is derived from a footnote in *Wong*. There, the court observed that conduct which lacks "a minimal requirement of some basis in reason" may lead to an inference of bad faith. 735 F.2d at 678 n. 32. Apex contends failure to "police price manipulation, accomplished with the knowledge that one half the market had conspired against the other, rise[s] to the level of irrationality sufficient to support an inference of bad faith."

As discussed above, there is insufficient probative evidence either of a conspiracy to manipulate or that the exchange defendants knew of any such conspiracy. The statements of Raber, offered by Apex, are misconstrued and made after any alleged conspiracy ended. What Raber may have thought after all was said and done does not establish the state of his knowledge on February 5 and 6. Helfer's emotional statements are of little evidentiary value, particularly in light of the fact that he admittedly had an interest in heating oil contracts.

Moreover, the evidence actually demonstrates that the conduct of the exchange defendants, whether or not wise in hindsight, had ample basis in reason. The record shows that the Exchange was concerned about the delivery situation in early February and received untrustworthy assurances from Goldman that Apex could make the required deliveries at GATX. When the truth became known on February 5, the Exchange faced a crisis and considered all possible reasons for the market difficulties: (1) manipulation by *Apex*, (2) a natural congestion, or (3) conspiracy by longs. The Control Committee then decided on a policy of mediation or "jawboning."

Representatives of the Exchange had numerous meetings with both sides in an effort to ease the crisis and succeeded in resolving all outstanding February 6 nominations by the evening of February 5 with

the exception of the Stinnes 300 contract nomination. Apex's obligations were clear on February 6 when the Exchange's President Leone told Apex that it should honor the Stinnes nomination or risk severe penalties if its objections to the nomination were overruled on Monday, February 8.

Apex quarrels with the Exchange's refusal to declare an emergency and give Apex a way out on the single nomination of 300 contracts. In light of the fact that many thousands of contracts were outstanding in future months, the Exchange had every reason not to shake the confidence of investors, (which Apex contends they were trying to preserve), by taking extraordinary measures over a 300 contract nomination. Instead, the Exchange took steps to resolve the outstanding delivery obligation through negotiation.

■ Apex's contention that the Exchange acted irrationally by not adopting Apex's interpretation of the rules is without merit. Construing the evidence in the light most favorable to Apex, the Exchange simply read ambiguous rules in a manner unfavorable to Apex. While it may have been possible, and even customary, for deliveries to be "flexible" and deferred by agreement, any such agreement was entirely voluntary under the rules. And, as discussed earlier, any prior practice of deferring delivery is of little probative value where, as Apex admits, September 1981 to February 1982 was a unique period and February was the only month within that period with falling prices and a significant number of early nominations. While the Exchange may have refused to give Apex all desired assurances, it actually acted to help Apex under the rules by jawboning the longs into accepting proposals for EFP's and deferred delivery.

The longs contend that Apex amassed a huge unliquidated short position in February heating oil contracts and thus ran the risk that the Exchange would enforce the existing rules by their terms and allow longs to insist on the honoring of their nominations. Apex, they argue, played this high-stakes game in the hope that if the crisis went too far the rules would be turned its way. It is not necessary to accept this persuasive argument for the Court to conclude, taking the probative facts in the light most favorable to Apex, that Apex's true quarrel with the Exchange is that it failed to interpret the rules as Apex would have liked. This does not raise an issue of bad faith.

Apex's brief is marred by vicious and unwarranted personal attacks on Raber which are apparently designed to convince the Court that he was a loose cannon, acting irrationally and in bad faith. These irrelevant and unprofessional references to Raber's drinking only serve to raise an inference that Apex is blowing smoke in the fervent hope that the Court will assume the presence of fire. Summary judgment is granted to the Exchange and Raber on Claim VII.

## ANTITRUST AND THE EXCHANGE DEFENDANTS

Apex's antitrust claims against Raber and the Exchange are "that these defendants, through their actions and inactions during February 1982, made what was only an attempted price fixing conspiracy a successful reality. The success of the conspiracy depended materially on the Exchange's and Raber's decisions to do nothing to stop it." In short, Apex believes the exchange defendants are liable for their "knowing acquiescence in the larger conspiracy" of the long defendants and their nonfeasance in not calling it to a halt.

This claim may be disposed of quickly. The Court has already concluded that summary judgment must be granted on Apex's conspiracy claims against the long defendants. Thus, there was no conspiracy for Raber and the Exchange to acquiesce in and summary judgment must be granted to them on any antitrust claims.

■ Even if a conspiracy among the long defendants had been satisfactorily established, Apex has still not pointed to evidence raising a material factual issue as to whether Raber or the Exchange joined it.

Put another way, in the face of explicit denials by the defendants, Apex has failed to meet its burden of producing significant probative evidence which tends to exclude the inference of independent non-conspiratorial action on the part of the Exchange and Raber. *Matsushita*, 106 S.Ct. at 1357.

Apex contends that the evidence of frequent communications between the exchange defendants and the conspirators "strengthens the inference of conspiracy and provides another genuine issue of material fact for proper resolution at trial." This argument is without merit.

Membership in a conspiracy may not be inferred from mere association. As Judge Weinfeld of this court has written:

> It is black letter law that to hold one as a participant in a conspiracy, he must by word, deed or conduct intentionally join the illicit enterprise; mere association with conspirators and presence at the scene of a conspiracy, even coupled with knowledge that wrongful conduct by others is being engaged in, are not by themselves sufficient to support an inference of knowing and intentional attachment to an illegal enterprise.

*Hunt v. Mobil Oil Corp.*, 465 F.Supp. 195, 231 (S.D.N.Y.1978) (footnote omitted), *aff'd mem.*, 610 F.2d 806 (2d Cir.1979). Raber and the Exchange had numerous communications with *both* Apex and the longs in their "jawboning" effort to resolve the difficulties in the first week of February. The concern of the exchange defendants that the potato fiasco not be repeated is not probative of conspiracy; rather it demonstrates a desire to *avoid* conspiracy. In this regard, it is also significant that the exchange defendants had no imaginable motive to conspire to manipulate their *own* market.

The fact that the exchange defendants may have known that certain longs disliked Apex simply does not infer an acquiescence by them in a concerted plot. On the contrary, discussions by various longs of possible threats of legal action or public attacks on the Exchange—offered by Apex as evidence of conspiracy by the longs—tends to disprove any conspiracy between the longs and the Exchange. In sum, Apex has presented no evidence that is inconsistent with independent action by the exchange defendants to resolve a troublesome market crisis. Construing the facts in the light most favorable to Apex, there is no genuine issue of material fact as to participation by Raber and the Exchange in a conspiracy in February 1982 and accordingly, summary judgment as to them on any antitrust conspiracy claims must be granted.

Finally, even if there had been a conspiracy and the Exchange defendants joined it, there is no evidence of the required bad faith. *See P.J. Taggares Co. v. New York Mercantile Exchange*, 476 F.Supp. 72 (S.D. N.Y.1979); *see also* the discussion of the absence of bad faith conduct by Raber and the Exchange, *supra*.

■ Apex argues that, whatever the case under the CEA, bad faith is not a prerequisite to antitrust liability of the exchange defendants. It is sufficient for present purposes to note that the Court agrees with Judge Weinfeld that a charge of bad faith "is essential when the conduct complained of, as here, is closely related to the exchange's performance of its statutory duty to maintain a fair and orderly market." *Id.* at 78. This requirement is essential for two reasons. First, commodity exchanges often must make it their business to impose a price on the market and impose restraints to alleviate market disputes. Lowering the antitrust plaintiff's "bad faith" threshold, coupled with the threat of treble damage liability, would inhibit proper Exchange regulatory action necessary to maintain an orderly market.

Second, the bad faith requirement in the context of CEA claims would make no sense in the absence of a similar standard in the antitrust area. The result urged by Apex would allow plaintiffs to circumvent the CEA by recasting disputes with exchanges under that act in terms of "restraint of trade"—a term easily applied since the exchange regulates an active market.

Accordingly, summary judgment is granted to the Exchange and Raber on all antitrust claims.

## COMMON LAW FRAUD: CLAIM VIII

In its eighth claim for relief, Apex alleges that the long defendants fraudulently represented to Apex (1) that their decision to nominate a large percentage of the No. 2 oil due them on the first three delivery days on the February 1982 Exchange contracts was a result of each long defendant's independent decision based upon valid business reasons and (2) that the nominated delivery dates were chosen for legitimate business reasons. Apex claims that in justifiable reliance upon the misrepresentations it paid excessive prices to the long defendants for the No. 2 oil in order to meet its obligations · under the February contracts.

At a trial, Apex would have the burden of proving fraud by clear and convincing evidence. *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir.1977). This "clear and convincing standard of proof should be taken into account in ruling on summary judgment motions...." *Anderson v. Liberty Lobby, Inc.*, — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).[3] While *Anderson* does not authorize a trial on affidavits, a Court must consider the substantive evidentiary standards in deciding whether the case requires submission to a jury. *Id.*

In order to prove its fraud claim, Apex must establish (1) that the defendant made a false representation of a material fact; (2) that the defendant intended to deceive Apex; (3) that Apex justifiably relied upon the misrepresentation and (4) that Apex was injured as a result of such reliance. *Indees v. American University of the Caribbean*, 546 F.Supp. 1342, 1346 (S.D.N.Y. 1982). Apex contends (1) that the longs' "need" for oil was falsely represented to Apex by the nominations made on Febru-

ary 2–5 and in telephone conversations, and (2) the longs' intent to adhere to their early nominations was falsely represented to Apex in telephone conversations.

▮ First, there is no evidence in the record before the Court to support a finding that a nomination is a representation of "need." A nomination, as defined by the rules of the Exchange, is merely the giving by the buyer "of written delivery or loading instructions to the seller." Rule 150.-09. Every buyer is required to make such a nomination whether or not it needs the oil. The reasons underlying the purchase and nomination may vary: the buyer may need the oil for its own use, or to trade with others to mitigate potential losses in a falling market, or it may seek to reap a profit from taking advantage of a known or rumored overextended seller. Whatever the reason for the purchase, the nomination itself is not a representation of "need" for the oil.

The other claimed misrepresentations were statements allegedly made by telephone by representatives of Belcher New Jersey, Inc., The Belcher Company of New York, Inc., Belcher New England, Inc., Warren, and Northeast to Edwin Wahl of Apex. Apex alleges that in these conversations Wahl was told or led to conclude that these companies (1) intended to adhere to the terms and conditions of the nominations that they had previously submitted to the Exchange and (2) had a need for the oil as nominated or would have such a need in the very near future.

Before addressing the merits of the claims, the Court notes that these conversations do not involve the Coastal Corporation, Coastal States Marketing, Inc., Belcher Oil Company, DiMauro, Triad, TIC, Stinnes Corporation, Stinnes Interoil, Inc., Northeast Petroleum Industries, Inc., Northeast Petroleum Corporations, and Eastern. Apex argues that these other defendants are liable because the state-

---

**3.** *Anderson* arose in the context of libel litigation; however, the Supreme Court's holding applies to "all litigants regardless of the substantive nature of the underlying litigation." *Ander-*

*son,* — U.S. at — n. 1, 116 S.Ct. at 2515 n. 1 (Brennan, J. dissenting); *but see* — U.S. at —, 106 S.Ct. at 2520 (Rehnquist, J. dissenting).

ments were made in furtherance of a conspiracy against Apex. Since Apex has failed to raise a triable issue of fact as to the existence of any conspiracy, its attempt to impute statements of certain defendants to others under a conspiracy theory must fail.[4] Thus, there is no evidence that these other defendants made any misrepresentations and, therefore, summary judgment is granted to them on the eighth claim for relief.

The defendants alleged to have made representations, Northeast Petroleum Corp., Warren, The Belcher Company of New York, Inc. and Belcher New Jersey, Inc., argue that Apex was under an absolute contractual duty to deliver the oil on the date nominated and, accordingly, Apex could not rely to its detriment on their alleged representations of need. Where a plaintiff claims it was induced by representations to do that which it was already legally obligated to do there is no causal connection between the alleged misrepresentation and any injury to the plaintiff. *See, e.g., Ryan v. J. Walter Thompson Co.,* 453 F.2d 444 (2d Cir.1971), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972); *The Toledo Trust Company v. Nye,* 588 F.2d 202 (6th Cir.1978); *Coons v. Kidder, Peabody & Co., Inc.,* 539 F.Supp. 1145 (S.D.N.Y.1982).

Apex admits that if it were legally obligated to deliver the oil on the date nominated, the fraud claim must fail. Apex asserts, however, that the Court may not find that Apex was legally obligated to deliver the oil because (1) the nature of its contractual obligation is a disputed issue of material fact, and (2) the defendants may not rely upon the contract because they were acting pursuant to an unlawful conspiracy. The latter of these two grounds is vitiated by the grant of summary judgment on all conspiracy claims. Thus, the Court is left with the issue of Apex's contractual obli-

gation. The parties argue at length about whether extrinsic evidence of industry practice may be considered by the Court on this point. Such evidence "is permitted for the purposes of qualifying the meaning of a contract where otherwise ambiguous...." *Western Union Telephone Co. v. American Communications Ass'n, C.I.O.,* 299 N.Y. 177, 184, 86 N.E.2d 162 (1949). The question not addressed by either Apex or defendants is whether the issue of Apex's contractual obligation is material.

The parties do sharply dispute the terms of the contract. Defendants argue that the combination of the rules and the nominating forms create an unambiguous obligation for a short to deliver at the time and in the manner nominated by the long. Apex counters with allegedly admissible evidence of an industry practice under which longs usually agree to take delivery throughout the month. This practice, it contends, raises a material fact issue as it its obligations. There is no need, however, for the Court to parse the rules and forms to determine whether an issue of fact exists as to the contractual obligation to deliver because, in the context of this case, any such analysis is irrelevant.

As events unfolded in the early days of February 1982, it was not the contract (nor defendants' representations), but the *Exchange,* and its power to impose severe sanctions for non-compliance with the terms of the contract as the Exchange interpreted them, which caused Apex to honor the nominations and to pay premiums to various defendants. The Exchange refused to rule on the validity of the February contracts when Apex sought to have the Exchange stretch out its delivery obligations but, as Apex states in its brief, "beginning on February 3, 1982 and continuing thereafter, the Control Committee took the position that Apex was required to

---

**4.** Apex suggests in its memorandum that misrepresentations may be imputed to the remaining defendants under the principle of aiding and abetting a common law fraud. Apex has not, however, alleged, much less offered evidence to prove, that anyone "aided and abetted" a fraud.

Aiding and abetting fraud—like fraud itself—must be pleaded with particularity. *Armstrong v. McAlpin,* 699 F.2d 79, 92–93 (2d Cir.1983); *see also* Fed.R.Civ.P. 9(b). Having failed to allege aiding and abetting, that theory of imputing liability too must fail.

make delivery under the February contracts at precisely the times nominated by the long defendants."

Thus, whether or not Apex had a pre-existing legal obligation to deliver the oil based on the contract, Apex perceived an overriding obligation to make delivery based upon the position taken by the Exchange and clearly acted in reliance on that perception when resolving its delivery obligations. Indeed, Apex has conceded as much: "Because the delinquency penalties are so severe ... both in terms of actual dollars and in damage to reputation, the Exchange's refusal to rule on the validity of the Stinnes nomination and its threat to make a retroactive finding of delinquency compelled Apex to pay defendants [extortionate prices]."

■ After construing the evidence in the light most favorable to Apex, this Court holds that no reasonable jury could find that Apex acted in reliance upon anything other than its perception that the Exchange would impose severe and reputation-harming sanctions for failure to deliver on the dates nominated. Seen in this light, it is evident that the alleged misrepresentations by the defendants were not material and that Apex did not rely upon any such misrepresentations. The Court reaches the same conclusion whether or not the "clear and convincing" standard applicable in cases of fraud is applied to Apex's proofs at this stage of the proceeding. *See Anderson,* — U.S. —, 106 S.Ct. 2505.

Apex has also failed to raise a material fact issue as to the other elements of an action for fraudulent misrepresentation. First, Apex has failed to demonstrate that any actual falsehoods were uttered. There is no evidence to indicate that statements such as "I intend to adhere to my early nomination" were not truthful when made. No doubt the longs would have adhered to their nominations if Apex had not bought them out. And, as discussed earlier, statements of need are not misrepresentations in a market of this sort. Every participant in an active market has need for value and it stretches the bounds of semantics for

Apex to assert that a representation of need could be false in this context.

Finally, while materiality and reliance are always closely related in the context of a fraud action, it may separately be said that Apex could not justifiably rely upon any of the alleged misrepresentations even in the absence of an overriding obligation imposed by the Exchange. No reasonable jury could believe that, in the aggressive trading on the Exchange, Apex would perform any act because another market participant "needed" or "wanted" performance.

Summary judgment is granted to defendants on Claim VIII.

### SECTION 4b: CLAIM VI

In the Sixth Claim for Relief, the long defendants are each charged with violating Section 4b of the CEA, 7 U.S.C. § 6b, which provides in pertinent part:

It shall be unlawful ... for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ...

(A) to cheat or defraud or attempt to cheat or defraud such other person;

(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;

(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person; or

(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such per-

son, or become the seller in respect to any buying order of such person....

"[Section] 4b, to put it mildly, is not an easy provision to construe. ... 'While the intent to outlaw fraud is clear from the (A)–(C) subparagraphs, the syntactical mess which precedes them makes it difficult to answer some basic questions about coverage.'" *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir.1980) (Friendly, J.) (citation omitted), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1980). Judge Friendly did, however, offer guidance as to the reach of 4b when he wrote that the section is not "limited to cases coming within its crabbed language," *id.* at 323, and it does not only prohibit "'any person' from defrauding 'any other person' in connection with the making of a futures contract for or on behalf of that other person." *Id.* at 322.

■ The defendants have moved for summary judgment on the grounds that Section 4b applies only to persons who act "for or on behalf of" the plaintiff in making a futures contract; since none of the long defendants acted for or on behalf of Apex, they argue, the claim should be dismissed. Thus, the central question raised by defendants on this motion is whether 4b can be read to apply to brokered transactions between longs and shorts so as to hold principals accountable to each other. Defendants argue that this question was not resolved in *Leist*. This Court disagrees and finds that Judge Friendly's expansive interpretation of 4b encompasses a case such as this. Even under this broad reading of 4b, however, summary judgment must be granted to defendants because no reasonable jury could conclude that they committed any of the proscribed acts.

As stated earlier, there is no genuine issue of material fact as to any claimed fraudulent or false statement by any long. First, no actionable statements were made. And second, in the context of the Exchange's stance regarding the enforcement of early nominations, long statements as to why they were insisting on early delivery were neither material nor relied upon by Apex.

■ While there is evidence that a long or longs may have been out to "get" Apex and that Apex was not well liked after having massively sold the market short, there is no factual issue raised that any long sought to cheat, defraud or deceive Apex. As has been discussed, the decisions of certain longs to nominate for early delivery and to stand on those nominations were in accordance with the rules of the Exchange as that body chose to interpret and enforce them. The fact that Apex was ultimately placed in the position of having to pay premium prices for oil to cover its delivery obligations was not the result of cheating or deceit. Rather, it resulted from the proper play of market forces, the action of the Exchange, and the high risk strategy of Apex in amassing its short position in the first place.

No genuine issue of material fact exists as to a violation of Section 4b of the CEA and summary judgment is therefore appropriate on Claim VI.

## CONCLUSION

Summary judgment is granted to the defendants on all eight claims in the Amended Complaint and those claims are dismissed. The Court need not reach the various *in limine* motions or Stinnes Corporation's separate motion for summary judgment. All motions and cross-motions for sanctions pursuant to Fed.R.Civ.P. 11 are denied.

So Ordered.